**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| DR. BESSIE (CHIA) SOO and DR. KANG (ERIC) TING, | ) ) ) | **CIVIL ACTION NO. _____** |
| Plaintiffs, | ) ) | **COMPLAINT** |
| v. | ) ) | **BREACH OF CONTRACT AND** |
| BONE BIOLOGICS CORPORATION, a Delaware corporation, BRUCE STROEVER, an individual, JOHN BOOTH, an individual, STEPHEN LANEVE, an individual, and MTF BIOLOGICS (f/k/a THE MUSCULOSKELETAL TRANSPLANT FOUNDATION, INC.), a District of Columbia non-profit corporation, | ) ) ) ) ) ) ) ) ) ) | **TORTIOUS INTERFERENCE** **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

1.      Plaintiffs Dr. Bessie (Chia) Soo ("Dr. Soo"), and Dr. Kang (Eric) Ting ("Dr. Ting") (collectively, "Plaintiffs"), former directors and/or former consultants of Bone Biologics Corporation (hereinafter "BBC" or the "Company"), by and through their attorneys, hereby submit this Complaint bringing claims of breach of contract and tortious interference with contract, against BBC, certain members of BBC's board of directors (the "Board") and/or managers, and former controlling stockholder MTF Biologics ("MTFB").[1]  Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by counsel, including (among other things) a review of publicly available information (including, *inter alia*, BBC's filings with the United States Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports,

---

[1] MTFB was formerly known as The Musculoskeletal Transplant Foundation, Inc.; the latter "rebranded" itself as MTF Biologics in late 2017.  *See* https://www.prnewswire.com/news-releases/worlds-largest-tissue-bank-rebrands-to-mtf-biologics-300529986.html (last visited (abbreviated hereinafter "l.v.") July 9, 2019).

investor conference transcripts, publicly available filings in lawsuits, information on BBC's own website, and other matters of public record).

## JURISDICTION AND VENUE

2.      Plaintiffs bring this complaint under federal diversity jurisdiction, 28 U.S.C. § 1332, the parties are completely diverse in citizenship, and the amount in controversy exceeds $75,000.

3.      This Court has personal jurisdiction over Defendants because, among other things, BBC maintains and/or maintained principal executive offices in the Commonwealth of Massachusetts, and because BBC and/or the other defendants transact and/or transacted business within the Commonwealth of Massachusetts, and the wrongful conduct alleged herein took place within Massachusetts. The exercise of jurisdiction by this Court is permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper herein pursuant to 28 U.S.C. § 1391(b), because, among other things, a material portion of events from which the claims set forth herein arose took place in this district.

## THE PARTIES

5.      Plaintiff Dr. Soo is a Professor in the UCLA Department of Orthopedics, and a Vice Chair for Research in the UCLA Division of Plastic and Reconstructive Surgery.  Dr. Soo graduated from UCLA *magna cum laude* with an undergraduate degree in biology, and from UCLA in 1993 with election to the prestigious national medical honor society Alpha Omega Alpha. Dr. Soo was certified by the American Board of Plastic Surgery in 2005 and made a Fellow of the American College of Surgeons in 2007.  Dr. Soo is one of the world's foremost experts on the NELL-1 protein, described below, and has authored over 100 peer-reviewed publications on musculoskeletal regeneration, cutaneous repair, and translational applications of stem cells.  Dr.

Soo has also invented over sixteen (16) patents in the area of regenerative medicine and is an expert on large and small translational animal models for device, combination product, and drug development.  Dr. Soo is a founder of BBC and served as a member of BBC's Board of Directors from 2014 to April 2017.  Dr. Soo is a citizen of the United States and resides in Los Angeles County, California.

6.      Plaintiff Dr. Ting is a Professor and Chair of the Section of Orthodontics and the Division of Growth & Development at the UCLA School of Dentistry. He is an attending of the UCLA Craniofacial Team, an internationally renowned specialty-collaborated center that is the largest and top ranked in the Western U.S.  Dr. Ting is also a dual clinician-scientist with multiple National Institutes of Health (NIH) and American Association of Orthodontists Foundation (AAOF) fundings to develop NELL-1 in the context of therapy for craniofacial and orthopedic diseases.  Dr. Ting is a founder of BBC and served as a member of BBC's Scientific Advisory Board from about 2014 to early 2017.  Dr. Ting and Dr. Soo are married.  Dr. Ting is a citizen of Taipei and travels in the United States on an O-1 Visa, and when in the United States Dr. Ting stays primarily in Los Angeles County, California.

7.      At all times material hereto, Defendant BBC was and continues to be a Delaware Corporation, authorized to conduct business and conducting business in the Commonwealth of Massachusetts, with its principal place of business located at 2 Burlington Woods Drive, Suite 100, Burlington, Massachusetts 01803.

8.      Defendant Bruce Stroever ("Stroever") was at times relevant hereto a director of BBC and one of MTFB's designees on the BBC Board.  Stroever served as the Chairman of BBC from 2012 until June 2018.  Stroever was a longstanding senior executive of MTFB, joining MTFB in 1988, becoming President in 1992 and CEO in 1996, and retiring in mid-2018 from both

positions.  Upon information and belief, at all times material to the issues herein, Defendant Stroever has resided in the State of New Jersey.

9.      Defendant John Booth ("Booth") has been a director of BBC since 2015. Defendant Booth was designated to BBC's Board by MTFB, Booth is the CEO (since 2004) and a director (since its inception in 1996) of a Minnesota-based company named Spineology, which since at least the early 2000s has had extensive business and financial ties to MTFB.[2]  Upon information and belief, at all times material to the issues herein, Defendant Booth has resided in the State of Minnesota.

10.     Defendant Stephen LaNeve ("LaNeve") is a director of BBC and a designee of MTFB.  Defendant LaNeve is a long-time employee of BBC, having served as its CEO and President for almost four years, since August 2015.  LaNeve is also a director and co-founder of a competitor of BBC by the name of SkelRegen LLC, a Delaware company of which Defendant LaNeve's brother (attorney Todd LaNeve) is the current CEO, and BBC's "Chief Medical Adviser" Scott D. Boden is reportedly "Director of Scientific Affairs."  Defendant LaNeve was formerly SkelRegen's CEO, succeeded in this role by his brother Todd.  However, Defendant LaNeve "continue[d] to have a key governance role with the SkelRegen as co-founder and director," "assist[ing] with broad strategic and financial direction setting for the company."[3]  Upon

---

[2] MTFB is and/or has been not only a strategic partner and supplier, but also a creditor, of Spineology.  According to Spineology's 2013 audited financial statements, in mid-2013, MTFB, as lender, entered into a $2 million credit agreement with Spineology, the terms of which contemplated its extension until mid-2019.  Those materials also noted that the "lender [MTFB] has a security interest in the Company's [Spineology's] internally developed intangibles and intellectual property."  MTFB and Spineology share at least one patent and likely more, issued in late 2013, for a product described as "a kit and a method of using a kit for treating bone including a fill material mixture made of osteoconductive material, osteoinductive material and a lubricating carrier, a porous container to receive the fill material mixture and a tool that flowably introduces the fill material mixture into the porous container."

[3] SkelRegen was founded in September 2012 and is a competitor of BBC.  SkelRegen is or was headquartered in Westchester, Pennsylvania (reportedly just minutes from Defendant LaNeve's home).  SkelRegen's is reportedly "the leader in small molecule musculoskeletal tissue regeneration and the first to identify multiple small molecules that are osteoinductive and target different aspects of the musculoskeletal tissue formation pathway."  Upon its founding in 2012, *Orthopedics This Week* reported on SkelRegen in an article titled "Bone Regeneration Focus of New Firm."

information and belief, at all times material to the issues herein, Defendant LaNeve has resided in the State of Pennsylvania.

11.    At all times material hereto, Defendant MTFB was and continues to be a District of Columbia non-profit Corporation, authorized to conduct business and conducting business in the State of New Jersey, with its principal place of business located at 125 May Street, Suite 300, Edison, New Jersey 08837.  MTFB claims to be the largest tissue bank in the world, "dedicated to providing clinically sound, safe allograft tissue" and "comprised of a national consortium of academic medical institutions, organ procurement organizations and tissue recovery organizations."  At the time of the events in question, MTFB was by far BBC's largest stockholder, with an approximate 35% equity holding.  MTFB has also positioned itself as BBC's "strategic partner" by, *inter alia*, linking one of MTFB's key products (DBX®[4]) as a "companion product" to BBC's main product, NELL-1.  DBX® standing alone faces declining performance and profitability without NELL-1.  Thus, MTFB stands to gain tremendous benefits from the combined use of NELL-1 and DBX® as a "fusion device."  BBC concedes in public statements for many years that it is "highly dependent" on MTFB.[5]  MTFB, alone and in conjunction with new BBC Chairman Don Hankey and affiliates, were controlling stockholders of the Company at relevant times to the events herein, and MTFB exercised this domination and control of BBC in numerous material respects.

---

[4]DBX® is a type and brand of DBM, or "demineralized bone matrix."  DBM is purported to be osteoinductive bone, the collagen matrix of allograft bone that remains after extensive processing that removes blood, cells, and inorganic minerals.

[5]A May 2018 reported titled "6 Things to Know about Bone Biologics" by Shayna Korol appearing in Becker's Healthcare (a healthcare industry news and analysis journal) listed: "3. The Musculoskeletal Transplant Foundation acquired Bone Biologics in 2006. Since the acquisition, MTF has been the major shareholder and primary funder." https://www.beckersspine.com/biologics/item/41006-6-things-to-know-about-bone-biologics.

## BACKGROUND AND FACTS

12.     This action brings claims against BBC, certain members of BBC's Board/executive management,[6] and former controlling stockholder MTFB.

13.     Plaintiffs are founders of the Company and early investors in BBC, an early-stage biotech startup company.  BBC's predecessor company, Bone Biologics, Inc., was founded in 2004.  In October 2014, the completion of a reverse merger between Bone Biologics, Inc. and AFH Acquisition X, Inc. formed BBC.[7]

14.     Plaintiffs were directly involved in and responsible for the original discovery and development of NELL-1, BBC's flagship product.[8]  NELL-1 is a recombinant human protein growth factor and a powerful and specific bone and cartilage reformation product providing regulation over skeletal tissue formation and stem cell differentiation during bone regeneration.

15.     NELL-1 is subject to numerous issued patents owned by University of California Regents ("UC Regents"), with more than 175 claims.  BBC obtained (through technology transfer from the UCLA Technology Development Group ("UCLA TDG") on behalf of UC Regents) exclusive worldwide license to NELL-1 technology for domestic and international spinal fusion, osteoporosis treatment and trauma treatment, all standalone multi-billion-dollar markets which are projected to grow significantly in the next five to seven years.  Defendants have vocally, repeatedly and publicly recognized BBC's tremendous value reflected in NELL-1's significant

---

[6] The current members of the BBC Board are Don Hankey, Sr., his son Bret Hankey, and Defendants LaNeve and Booth.  The members of the BBC Board at the time of the events described herein were:  Stroever, LaNeve and Booth (all MTFB designees), Bret Hankey, and Jimmy Delshad.

[7]     https://www.marketwatch.com/press-release/bone-biologics-corp-completes-merger-with-afh-acquisition-x-inc-2014-10-16 (l.v. July 9, 2019).

[8] The original founders of the Company were Dr. Soo, Dr. Ting, and Dr. Ben Wu.  These three individuals may be collectively referred to at times herein as the "Founders."

potential.  Testing and evaluation of NELL-1 to date has been highly positive, further indicative of NELL-1's tremendous commercial potential.

16.     The Founders' original work and effort provided the groundwork for the development of NELL-1.  Neither NELL-1 or BBC would have been possible without the tremendous efforts and contributions of the Founders, including the two Plaintiffs herein.  The Founders (including Plaintiffs) secured tens of millions of dollars in grants for original and early research into NELL-1, which provided the foundation for NELL-1's commercial potential and BBC's existence in the first place.

17.     Following the completion of several key milestones, in 2016 BBC expanded its "Field of Use" definition beyond just spinal fusion within the NELL-1 license agreement with UCLA TDG.  Consistent with that expansion, in June 2016 BBC entered into an option agreement for an exclusive license agreement with UCLA TDG for worldwide application of the NELL-1 protein for the two other markets mentioned above (osteoporosis and trauma).

18.     The tremendous value of BBC, as reflected in the significant potential of NELL-1, is in the process of coming to fruition.  BBC's August 2018 presentation further highlighted the "Strong IP Barrier" favoring NELL-1, exemplified by the extensive patent coverage discussed above[9] (and dovetailing with BBC's recent representations in its 2018 Annual Report (filed March 29, 2019) that BBC has "an intellectual property portfolio that includes exclusive, worldwide licenses from UCLA TDG which we believe constitute a formidable barrier to entry"[10]).

19.     The tremendous potential value of BBC is neither surprising nor unrealistic, considering the state of the public markets with respect to emerging biotech companies.  An

---

[9] http://bonebiologics.com/wp-content/uploads/2018/08/BBLG-Investor-Presentation_August-2018.pdf (l.v. July 9, 2019).

[10] https://www.sec.gov/Archives/edgar/data/1419554/000149315219004221/form10-k.htm (at p. 9) (l.v. July 9, 2019).

October 31, 2018 report in *The Wall Street Journal* stated, among other things, that "[b]iotech

companies have raised $5.56 billion in initial public offerings so far this year, placing 2018 on

track to be one of the industry's best-ever for IPOs."[11]   The report, titled *Biotechs With No Drugs*

*in Trial Are Raising Millions in IPOs*, also stated, *inter alia*:

> At least six more biotechs are on deck to go public before the year is out,
> including NGM Biopharmaceuticals Inc., whose lead drug, to treat a type of fatty
> liver disease, is in midstage studies. On Wednesday, shares of Orchard
> Therapeutics PLC and Twist Bioscience Corp. made their public debuts after the
> companies raised $200 million and $70 million respectively in IPOs.
>
> Early-stage biotechs—whose products aren't yet tested in human clinical trials
> or are tested only in early Phase 1 studies—represented 37% of biotech IPOs
> through the third quarter of 2018 and had an average market value of $535
> million, according to Ravi Mehrotra, partner at investment bank MTS Health
> Partners. That is up from 35% of biotech IPOs with an average market value of
> $471 million in 2015.

20.    The report in *The Wall Street Journal* also noted a number of other specific

examples, including:

> **Allogene Therapeutics Inc.**, <u>ALLO -2.35%</u> founded last year, has no product
> revenue and is years away from getting a drug approved. Yet it raised $373
> million earlier this month in one of the largest-ever initial public offerings for a
> biotech.
>
> **Rubius Therapeutics Inc.**, <u>RUBY -1.68%</u> in Cambridge, Mass., raised some
> $277 million in its July IPO, the second most of any biotech this year according
> to Dealogic, despite having not yet tested a drug in humans.
>
> **Homology Medicines Inc.**, <u>FIXX -5.94%</u> whose lead gene-therapy product
> won't start clinical trials until 2019, raised $166 million in its March IPO—three
> years after its founding—and now has a market value of more than $700 million.

21.    NELL-1's growing success and significant potential has not gone unnoticed.  For

example, NELL-1 was featured very favorably in the June 2018 edition of *Upward Magazine*, the

"Magazine of the ISS [International Space Station] National Lab" in a report titled "Building

---

[11]https://www.wsj.com/articles/ipo-market-rewards-early-stage-biotechs-1540983601?emailToken=
a463d28865f300c4c0c19bc6261223e6cMVD0n7Y/EGfLsDh0VMA5awnnGGYrJ/Nsy4lnkOrn9hyHEnW+m1ztrcb
Bd8jGnIRd9hgnhBVv6zbfA0UCYXQRWc7+MTrsRtQSfJslrjleXs%3D&reflink=article_email_share (l.v. July 9,
2019).

Bones – Testing a New Osteoporosis Therapy with Mice in Microgravity."[12]  In July of 2018, the NELL-1 project ("Development of NELL-1 Bone-Growth Systemic Therapy") was selected as the winner of the 2018 International Space Station Innovation Award in the Biology and Medicine Category.

**The Agreements Between BBC and the Founders**

22.     Effective October 2, 2015, the Company and all of the Founders entered into a Letter Agreement pursuant to which the Founders would deliver to the Company all past work product and past data related to NELL-1.  In exchange, BBC agreed to the issuance of an aggregate of about 1.15 million shares of the Company's common stock (to be split equally among the three Founders).

23.     On January 8, 2016, each Founder entered into a separate but substantially identical Professional Services Agreement with BBC (collectively, the "FPSAs").  Under the FPSAs, each Founder was granted 10-year options (to vest in stages) to purchase 1,800,364 shares of BBC common stock (corresponding to about 4% of the BBC's outstanding common stock on a fully diluted basis).  Additionally, each Founder was to be paid an annual consulting fee in either cash or stock (at the BBC's option).[13]

24.     Pursuant to the FPSAs, the Founders agreed to provide certain services to the Company, such as strategic advice and strategic introductions to the Company's management team.  The specific services were set forth in Exhibits to each FPSA.

25.     According to the FPSAs, the services to be provided by the Founders pursuant to the FPSAs were as follows:

---

[12] https://upward.iss-casis.org/building-bones/ (l.v. July 9, 2019).

[13] On June 1, 2016, the Company agreed to issue to each Founder 10-year stock options to purchase 33,105 shares of the Company's common stock at an exercise price of $2.05 per share with an aggregate fair value of $192,906 as an adjustment to the FPSAs.

Description of Services

. . . Over the term of this agreement, the Advisor [14] will render services supporting and advising the Company with respect to the following initiatives:

1. Long term IP strategy, including providing input on IP/Patent approach – Patent Term Extension (PTE), Patent Term Adjustment (PTA), New Filings; guiding the Company's R&D focus, drive R&D direction, and build R&D programs (subject to mutually acceptable sponsored research agreements [SRAs] and receipt by Advisor from Company the necessary resources and authority to pursue IP and R&D programs recommended by the Advisor) to produce patent applications that if awarded will extend patent life of NELL-1 by at least 12 years; improve NELL-1 performance that if produced/purified/delivered properly by GMP protein contractor can increased Nell-1 half-life by 25% over current Nell-1 patents set to expire in 2019, and work closely with Company patent counsel to build a robust IP "wall" around the Company's product portfolio.

2. Pursuant to one or more sponsored research agreements to be entered into with Company on or before Jan 15, 2016, Advisor will support sponsored research services to be conducted on behalf of Company, concerning, among other things, basic NELL-1 characterization (e.g., bioactivity, mechanism of action, etc.), NELL-1 pipeline product work (e.g., chemical modification, targeted delivery, etc.), disease indication related work (e.g., materials, stem cells, diagnostics, wireless health continuous monitoring, etc.)

3. Review and implementation support of the third-party partner, which the Company contemplates will be Diosynth (Raleigh, NC), including protein synthesis proposal, extending from the NELL-1 molecule characterization / formulation to pre-production

4. Review data on toxicity, immunogenicity, carcinogenicity and reproductive testing per agency guidelines across potentially three divisions (device, biologics, drugs)

5. Review data on animal testing following the Boden Model and to potentially include sheep (outside the model)

6. Review data on lyophilization and final manufacturing/assembly including DRM processes and specifications

7. Review data on final kit configuration to include components (vials, syringes, diluents, cannula, etc.), inner and outer trays and cartons, ship/drop, temperature stress testing

8. Review data on Clinical, Regulatory and Reimbursement strategies for selected indication(s), and Advisor shall provide real-time product evaluation,

---

[14] "Adviser" referred to the respective Founder who was party to that particular FPSA, *i.e.*, Dr. Soo, Dr. Ting, or Dr. Wu.

including providing confidential feedback of product concepts before farming out to contract labs.

9. Company Advanced Development Program - Developing novel product concepts that maximize the growth in company valuation by identifying products concepts and refining the product concepts to work synergistic with business development, IP strategy, regulatory timeline, manufacturing capability, marketing, and sales.

10. Company Acquisition Targets. Identification of Company third party acquisition targets, and also contribute to the technical due diligence process of evaluating technologies that will build value for Company.

11. Recruiting SAB, KOL, and consultant team. Advisor will use his/her connections to support the Company's recruitment of the most prominent scientists, visible clinicians, and productive consultants to support the growth of the Company. [[15]]

26.     Pursuant to the FPSAs, in return for his/her services, each Founder was granted ten-year options to purchase 1,800,364 shares of BBC's common stock, corresponding to 4% of the BBC's outstanding common stock (on a fully diluted basis) at an exercise price of $1.59 per share. These options were to vest in portions on an annual basis over a period of several years, and in full immediately upon a change-of-control transaction.[16]   Additionally, pursuant to the FPSAs, beginning January 1, 2017 the Company was to pay each founder an annual consulting fee of $200,000, either in cash or BBC common stock (at BBC's option).[17]

---

[15]  https://www.sec.gov/Archives/edgar/data/1419554/000149315216006735/form8-k.htm (l.v. July 9, 2019); and https://www.sec.gov/Archives/edgar/data/1419554/000149315216006735/ex10-1.htm (l.v. July 9, 2019).

[16] https://www.sec.gov/Archives/edgar/data/1419554/000149315216008297/form10-k.htm (at p. 9) (l.v. July 9, 2019) ("The shares subject to the Options will vest 25% on each of the first, second and third anniversary of the effective date and 12.5% on each of the fourth and fifth anniversary of the effective date. The options fully vest on a change of control of the Company, if the Company terminates the [FPSA] without cause or the Founder terminates the [FPSA] with cause.").

[17] On June 1, 2016, the Company agreed to issue these Founders additional ten-year stock options to purchase 33,105 shares of BBC common stock at an exercise price of $2.05 per share, "as an adjustment to the [FPSAs] with each of the Founders dated January 8, 2016."
https://www.sec.gov/Archives/edgar/data/1419554/000149315216012301/form10-q.htm (at F-19) (l.v. July 9, 2019).

**BBC and the other Defendants and Board Members Cut the Founders Out of the Loop and Prevent Them from Performing Their Obligations as a Pretext for Claiming "Breaches" of the Agreements, to Cover for BBC's Own Breaches of The Agreements.**

27.     After MTFB assumed its controlling position in BBC, its tenure was riddled with serious mismanagement of the Company by itself and its designees, and a corporate and business environment rife with poor (even non-existent) corporate governance, lack of transparency, and significant internal strife.  As a result, MTFB's relationships with the Founders and other major and long-time investors in BBC deteriorated.

28.     For instance, after assuming its controlling stake and dominant role in BBC, MTFB consistently refused to share with the Founders of the Company material information about the scientific progress of NELL-1.

29.     The Founders, who discovered and guided the development of NELL-1 from the very beginning, each had positions with the Company, either on the Board or on the Company's Scientific Advisory Board.  Dr. Soo and Dr. Wu were Board members until April 2017.  Dr. Ting was a member of BBC's Scientific Advisory Board until about that same time.  As such, the Founders should have been, and reasonably expected to be, provided access and information to allow them to adequately monitor the scientific progress of NELL-1, and in doing so have regular and complete access to testing and other scientific data in connection therewith.  However, they were routinely not allowed such access and information, and if anything provided with vague and incomplete access, information and materially inadequate follow-up in response to their concerns and inquiries.

30.     The Founders understandably became very concerned about data integrity and having their names and professional reputations associated with data and results that they were not permitted to, and thus were unable to, sufficiently review or verify.  This was particularly the case

since the Founders were also expected to publicly represent and vouch for BBC and the strength of its product, NELL-1, and BBC's business and operations.

31.     The Founders believed they were expected, indeed obligated, to have full access to and scrutinize this information, and to be able to sufficiently monitor the scientific progress of NELL-1 and the testing and other scientific data in connection therewith.  Instead, however, the Founders were barred by BBC and its management, other directors on the Board, and the Defendants, from seeing the raw data or testing materials and other material information for NELL-1.

32.     The Founders became increasingly uncomfortable at not being allowed access to sufficient data to conduct the necessary monitoring and verification, and instead being continually forced to rely upon (at best) incomplete second- or third- hand reports that they were unable to closely and rigorously scrutinize, question and verify.

33.     By October of 2016, BBC's lack of transparency with its own Founders and certain Board members (i.e., Dr. Soo and Dr. Wu) was continuing, and, if anything, had significantly increased.

34.     Issues were also being raised in 2016 concerning the overall performance of the Company's management, including perhaps most notably Defendant LaNeve.  BBC management's performance was subject to certain key performance indicators and, as stated in the Company's SEC filings, management's progress and success were tied "to a great extent upon the experience, abilities and continued services of" Defendant LaNeve and other MTFB-designated senior executives.  The performance of Defendant LaNeve, and BBC's management overall, was to be evaluated not just related to internal management of the Company, but also related to their ability to successfully raise outside funding and investment for the Company and its continued

operations and scientific testing.  However, Defendant LaNeve was not at all successful in these key performance requirements, and these failures were being scrutinized and criticized by the Founders (and other BBC investors) in 2016, including at the time LaNeve and the Company abruptly and falsely began to claim material "breaches" of the FPSAs by the Founders in the fall of 2016 and early 2017.

35.     Concerning the problems with mismanagement and lack of transparency, the Founders repeatedly advanced good faith proposals to attempt to alleviate the problems, but were stymied time after time by Defendants' resistance and intransigence and refusal to allow or implement needed key reforms.  For instance, in an email on October 26, 2016, Dr. Wu and the other Founders attempted to remedy the situation at least in part by proposing significant changes and improvement in the scientific reporting format and frequency with respect to BBC's reporting of the progress of NELL-1-related developments.  Dr. Wu's October 26, 2016 email attached a constructive and detailed proposal to improve the situation:

> Dear Board of Directors of Bone Biologics Corp:
>
> We are submitting this proposed science reporting format at the request of Bruce Stroever, Chairman of the BBC Board of Directors. As discussed in multiple Board meetings, Board calls, committee calls, and individual discussions, we the founders have repeatedly voiced our concerns of being uninformed of business and science decisions made by management. We are told that the management team needs significant freedom to independently operate on business decisions, and that we only need to know as much as other Board of Directors. We find this to be unsatisfactory with respect to business decisions that affect the founders directly and indirectly. Examples of undesirable consequences include the hiring scientific consultants, funding of needless scientific experiments that cost us time and money, and animal studies without proper scientific planning, could have been avoided if input from the founders were sought beforehand. We will keep this list short as they have already been presented to management and Board.
>
> More importantly, the science calls have been largely frustrating and ineffective as they have been overly simplistic and conveyed through intermediaries who did not perform the actual work. When we asked for details, very little additional information is available, and no insights are available as to the scientific thinking

involved, and the hypothesis moving forward. We are still waiting for answers to our questions on the Fuji data from June. We discussed the proper format several times but there is clearly no improvement. In response to the Board's recent request for proper reporting format in the science calls, we suggest the following.

Complete data should be submitted a full 48 hours before the call, with enough depth that we can discuss mechanisms and potential issues. The results should be summarized in powerpoint, and the actual data should be provided in the original raw data format. Statistics, if used, should be justified. This allows BBC to have a collection of well justified scientific data that can be validated, analyzed, and fully understood. Giving us the "readers digest" version is not acceptable, especially when the presenter cannot answer our questions, and cannot followup with the information after promising to do so. A good start is to collect all the raw data and explanations that we have requested from the previous calls.

Direct communication between Founders and the Fuji team and any subcontractors must be the primary mode of reporting. The consultants are great at presenting their slides, but they either cannot or refuse to answer our questions, and either cannot or will not get the answers from the source. We want to be able to ask the questions in real time directly, since we understand the full context and rationale of our questions. Given the financial constraints the company faces, the need to terminate some/all consultants is looming. When these consultants leave, it would take a lot of time and effort to re-compile the lost opportunity to gather the data as they come in, as a lot of information are currently completely hidden from founders. Therefore, allowing founders to interface directly with Fuji, in particular, will allow us to help BBC reduce cost, de-risk the loss of knowledge and time, and preserve the value for our investment. The founders have the same obligations for confidentiality and certainly more loyalty to BBC than consultants who will leave the minute the funds run out. A good start is to schedule a meeting between the Fuji team and the founders, so that we can get an accurate assessment on the true status of protein manufacturing.

Scientific budget goes hand in hand with project management. Where did all the money go? We have raised quite a lot of money over the past year, but the latest term sheets at $1 conversion seems to suggest that company value has not increased. We don't know how we arrived at this state from the business side, but as we would like to have some insight and input into our scientific investments. A good start is to show updated expenditure summary since 1/1/16 of all BBC scientific investments, detailing contractual fees, budget, breakdown and scope of work for consultants' scientific projects. This will allow us to help BBC track and prioritize current and future science investment when we raise more funds.

We have waited patiently for management to improve the reporting system which has kept the founders at arm's length. This is not appropriate at best as it

misrepresents a glaring problem to investors. We sincerely hope that this suggest format can finally address our concerns of being excluded.

36.     Dr. Wu's email, in essence, simply requested BBC and its Board and management to live up to their duties as directors and officers, as well as their contractual obligations to the Founders.  Nevertheless, Dr. Wu's email sparked indignation and vehement resistance from BBC's non-Founder directors and management, including LaNeve.  In particular, Defendant LaNeve (despite offering lip service that "[m]anagement believe[d] the founders are an important element of the company's 'asset mix'" and wanted to "accomplish a lot more together pulling in the same direction"), resisted, dissembled, and claimed Dr. Wu's detailed email proposal was somehow short on "specifics."  LaNeve then concluded by trying to "kick the can down the road" for discussion at some unspecified "future board meeting."

37.     The Founders' frustration understandably only continued and grew when their efforts to solve the problems and rectify the flawed and inadequate reporting structure and information flow were met only with continued obfuscation and lack of transparency.  Dr. Soo sent a follow-up email on October 28, 2016, which stated:

Re: science reporting

Hi Steve

Since the founders are scientists, we deal in facts. The fact is that despite repeated requests, we have not been able to engage with the people generating the primary raw data. We are given data second or third hand that we cannot verify adequately or interrogate directly. The fact is that on our Oct 26th, 2016 call with Bill Coffin and Bruce Stroever, Bruce flat out stated that he did not see how the founders possibly could help in commercial protein production or characterization.  Although management may make statements about wanting to engage the founders, the factual reality is that this has not happened. The position articulated by Stroever sheds some light on why this has not happened.

On a separate topic of deferred founders' compensation for the initial founders' agreement from Sept 2015, Stroever stated that the initial founders' agreement signed in Sept 2015 had no basis in his opinion -- despite it being approved by

the BBC [B]oard. Stroever said repeatedly on Oct 26th, 2016 call that the Founders were already paid through stock that they originally owned in the company and should not expect any additional payments.  This sheds additional light on the delays in getting the contracts in place, and the fact that the contractual payouts have not been honored.

Overall, the hostile statements made by Stroever as chair of the BBC [B]oard and the actual lack of founder engagement by BBC management, make it clear that engaging the founders is just lip service.  The founders have never been truly engaged, and now we know that it is management's mandate to exclude the founders.  What Ben's asking for is completely reasonable given the state of the company.

38.     BBC's and LaNeve's reaction to the Founder's legitimate observations and concerns was not to engage and communicate, or attempt any kind of constructive resolution or improvement, but instead to escalate, retaliate against, and finally terminate the Founders, and in doing so violate the terms of BBC's agreements with the Founders.

39.     In or about late November/early December 2016, the MTFB-designee defendants on BBC's Board and management began pressing the Founders with false and baseless accusations about the Founders' alleged violations of the FPSAs and their duties.  For instance, Defendant LaNeve began to claim that the Founders had failed to provide information documenting progress made on work purportedly required by the FPSAs, demanded this supposedly missing information by an arbitrary deadline just a few days away.  LaNeve abruptly claimed to "have no documented update on your collective work to modify NELL-1 in such a way that allows us [BBC] to file new C-o-M [Change–of-Matter] IP and have those changes either reduce cost to manufacture or improve performance in some way as we agreed in the PSA, exhibit #3 (effective 1/8/2016)."

40.     LaNeve suddenly claimed that this information was somehow eleven months overdue, and claimed to "need this status update by close of business on Tuesday, November 22nd, '16."

41.     The Founders, and specifically Dr. Soo, responded in an email dated November 22,

2016.  This email stated, among other things, that:

> . . . your statement "I have no documented update on your collective work to modify NELL-1 in such a way that allows us to file new C-o-M IP and have those changes either reduce cost to manufacture or improve performance in some way as we agreed in the PSA, exhibit #3 (effective 1/8/2016)", is disingenuous and inaccurate.
>
> First of all, the company was supposed to negotiate a sponsored research agreement with UCLA to get that work done (completely separate from the SRA for bioactivity testing and separate from the professional services agreement). As CEO, it should be clear to you that BBC never negotiated such an agreement or even provided any resources for such work to be performed, so for you to make the above statement and to ask for what we have accomplished, is frankly—disingenuous—and once again, highlights the lack of sincere engagement of the founders by the BBC management team that I had referred to in my 10-28-16 email to you. Second, despite never having an agreement from BBC with UCLA to perform such work, we have in fact filed several patents in 2015 and 2016 to improve the performance of NELL-1.
>
> *     *     *     *
>
> Since you are the BBC CEO, I would expect you to communicate with UCLA so that you can communicate accurate information to the BBC board and to investors on what is a part of the NELL-1 portfolio at UCLA.
>
> Lastly, I still have not gotten a response from you or Stroever with respect to my 10-28-16 email regarding: 1) the hostile statements made by Stroever as the chair of the BBC board that he did not see how the founders could add value to BBC and that he did not think founders should get paid and 2) the lack of sincere meaningful engagement of the founders by the BBC management team.

42.     In sum, the Founders vigorously disputed BBC's and other Defendants' false

accusations and called them out for what they truly were – baseless attempts to retaliate against

them and distract from the real issues, such as the gross mismanagement of the Company by MTFB

designee Defendant LaNeve and others.

43.     The Founders also took serious issue with the Company's representations in draft

SEC filings concerning these manufactured "violations."  On December 6, 2016, BBC CFO Deina

Walsh circulated draft minutes for a November 9, 2016 Board meeting.  These draft minutes

contained language making it clear that the Founders were being retaliated against for the criticisms and issues they had raised previously.

44.    In response, Dr. Wu sent a December 8, 2016 email to the Board stating:

Dear BBC Board,

Thank you for the draft minute[s]. I would appreciate an explanation for the statement: "If the Founders do not provide completed work product described in the PSA[18] then the Founders would be in breach of the agreement and would be given the option to supply information on the work that they have been undertaking according to the contract terms". I repeat my 11/23/16 question to Steve that remains unanswered: Can you please point me to the due date that is 11 months overdue per the PSA? First, the PSA was signed in Jan 2016 for a term of 5 years. Second, the deliverable[s] were absolutely contingent upon the company providing the necessary resources to accomplish the deliverables. Third, there were no specific due dates for deliverables. Therefore, Steve's absurd statement that the founders were 11 months overdue is insupportable.

This random, poorly thought-out attack on the founders came after our 10/26/16 letter to the Board delineating our concerns with scientific and business management of the company, and after our call with Bruce Stroever and Bill Coffin where we questioned the management team's performance, inability to raise any significant funds beyond the insiders, poor science reporting, and lack of transparency. Then, Steve invents an 11-month overdue deadline, creates urgency, changes the rules after the fact, changes the due date, and will most likely serve as the judge and juror to determine if the founders are in breach. This constitutes a form of retaliation that is simply inconsistent with proper corporate governance.

With respect to the SRA,[19] please clarify if the COI[20] was the only obstacle towards developing an SRA that will allow the founders to carry out some of the deliverables described in the PSA. The COI issue was news to the Founders. Separately, it was our understanding from Bruce's email to the board that BBLG[21] funds would run out Oct 15, 2016. Subsequently, documents sent to the board suggest that the most recent $1.2M note requires winding down BBLG operations to complete existing ongoing studies and suspending founders consulting agreements. We were told by Bruce that the funds would support only protein manufacturing – and that the founders are not qualified to contribute in that process. This sudden change in interest to fund the SRA documented is in direct contrast with ALL prior written communications and previous board

---

[18] "PSA" in this context stands for "[Founders'] Professional Services Agreements," or the FPSAs.

[19] "SRA" in this context stands for "sponsored research agreement."

[20] "COI" in this context stands for "conflict of interest."

[21] BBLG as used herein refers to BBC.

minutes that point to winding down.  Since the board minutes are the first time that we hear about starting new studies, how much funds are actually available for the SRA?  Neither the change in company direction nor the amount of funds have been communicated to the founders, yet the draft minutes make it appear that BBLG is waiting for us to complete the SRA.  Coincidentally, this abrupt U-turn occurs at the same time that Steve invents the 11-month overdue deadline.  This surprise is certainly consistent with my 10/26/16 letter to the Board regarding our concerns of being uninformed of business and science decisions made by management.  This retaliation adds to the inappropriate pattern of mismanagement and constitutes a glaring problem to investors.

Despite these concerns, we have been very active in our own scientific activities and we are very happy to supply information – after these questions are answered satisfactorily.  Given the unprofessional and heavily biased manner that this is mismanaged, the Founders request an independent committee comprising of major shareholders to be involved in judging if the founders are indeed in breach.  Steve is simply not qualified to handle this.  Several board members have requested a board meeting or board call.  On a side note, the draft minutes from the 11/9/16 board call contains incorrect information regarding the PSA and SRA that we can discuss then.

Best Regards,

Ben

45.     Five days later, on December 13, 2016, the Company informed the Founders that it was terminating each of their respective FPSAs effective January 12, 2017, purportedly for "cause," absent cure of the supposed "material breaches" by the Founders discussed in the emails above and in elsewhere herein.

46.     The Company and the Founders engaged in discussions thereafter concerning these issues and the false allegations of material "breaches" by the Founders.  The Founders engaged in these discussions at least partially in hopes of resolving the situation.  However, on or about March 23, 2017, Ms. Walsh, then BBC's CFO, circulated the Company's draft Annual Report on Form 10-K for the year ended December 31, 2016 to the Board for review and approval.  This draft 2016 Annual Report contained more false and inaccurate statements about BBC's termination of the FPSAs and the existence of "cause" to do so.  Another draft of the 2016 Annual Report that was

circulated on or about March 29, 2017 continued to contain false statements concerning alleged "breaches" by the Founders, and BBC having "cause" to terminate the FPSAs.

47.     For instance, BBC claimed there was "cause" for the Company to terminate the FPSAs due to material "breach," one of which was that the Founders had not filed patents for BBC. However, this was not a breach under the terms of the FPSAs. Exhibit 2 in the FPSAs made clear that the Founders had "pre-existing obligation to disclose and assign Patent rights to the University of California...," not BBC.

48.     After reviewing this latest draft 2016 Annual Report, the Founders responded that these statements were false and incorrect, and as a result refused to sign off on this version of the 2016 Annual Report.

49.     Despite the Founders' continued good faith attempts to discuss and the situation in hopes of resolving it on a fair and reasonable basis, the Company nevertheless improperly and unfairly terminated the FPSAs barely two weeks later (effective April 8, 2017), in doing so breaching the FPSAs.

50.     The Company stated in its final 2016 Annual Report Form 10-K, filed on March 30, 2017:

> On December 13, 2016, the Company provided written notice that it is terminating the agreement for cause. Absent cure of the material breach of the agreement, termination of the agreement shall be effective on March 31, 2017. The Company continues to work with the founders in an attempt to resolve all outstanding issues under the agreement.

> On June 1, 2016, the Company agreed to issue to each Founder a 10-year stock options to purchase 33,105 shares of the Company's common stock at an exercise price of $2.05 per share as an adjustment to the Professional Services Agreements with each of the Founders dated January 8, 2016.

> Dr. Soo and Dr. Wu are directors of the Company, and Dr. Ting is on the Company's Scientific Advisory Board. Each of the Advisors were involved in the founding of the Company.

> The Company later stated in its Form 10-Q filed on May 12, 2018, that:

On December 13, 2016, the Company provided written notice to each of the Founders that it was terminating the Agreements for cause, indicating that absent cure of the material breach of the Agreements, termination of the Agreements was to be effective on January 12, 2017. Despite lengthy discussions with the Founders, and multiple extensions of the termination date to accommodate such discussions, the Company was unable to resolve the outstanding issues under the Agreements, and the Company provided notice that the Agreements were terminated, effective April 8, 2017. Any shares subject to the stock options issued under the Agreements that were not vested on the date the Agreements terminated shall be forfeited on the date of termination.

51.      Neither BBC's Form 10-Q or its 2016 Annual Report on Form 10-K gave any indication as to the supposed reasons or purported "cause" for terminating its agreements with the Founders, who were responsible for the discovery and development of the Company's flagship product and to whom BBC owned its existence in the first place.  What these SEC filings did do, however, was falsely represent that the agreements had been terminated for "cause" -- they had not.  In fact they had been terminated in retaliation for the Founders' insistence that the Company be managed in a reasonable and appropriate manner, including with respect to its scientific reporting and the processes related thereto, and their insistence that BBC comply with its obligations under the agreements.

52.      BBC, itself and by and through the other Defendants, manufactured supposed "violations" by the Founders and "cause" to terminate the FPSAs, in order to retaliate against the Founders for seeking the necessary transparency to comply with their obligations in the first place.

53.      In doing so, BBC and the other Defendants themselves violated the agreements and/or caused the violation of the agreements at issue.

54.      BBC claimed that the Founders failed to provide completed work product described in the FPSA by a specific deadline, and were therefore in breach of the FPSAs.  This was wrong, however, both in fact and in principle, and based on nothing more than material misrepresentations by the Company itself.

55.     The parties had never agreed on any specific "deadline" by which the Founders were obligated to produce any "completed work product."  BBC and Defendant LaNeve concocted this false past "deadline" out of thin air, and then claimed it had somehow been missed in order to falsely manufacture "violations" of the agreement by the Founders.  As Dr. Wu stated in his earlier email, "Steve [LaNeve] invent[ed] an 11 month overdue deadline, creates urgency, changes the rules after the fact, changes the due date, and will most likely serve as the judge and juror to determine if the founders are in breach. This constitutes a form of retaliation that is simply inconsistent with proper corporate governance."

56.     Moreover, the "completed work product" that BBC and LaNeve alleged was not delivered was fully contingent upon BBC's providing the necessary resources to conduct and accomplish it in the first place – resources the Company never accomplished.   These were supposed to be the result of what was termed "sponsored research agreements" (SRAs," with respect to which the Company was to provide the "sponsor[ship]" -- in other words the funding – for the research.  BBC, however, never provided any such funding or "sponsorship," and/or at most provided insufficient funding/"sponsorship", to conduct the necessary work and research to begin with.[22]

57.     Moreover, and related to these false complaints of Founder "breaches," BBC and the other Defendants faulted the Founders for not coming up with and delivering "patents" for BBC, which made no sense because any new "patents" would have necessarily have to have been owned by UCLA, not the Founders or BBC itself, as provided in the FPSAs, and Exhibits thereto.

---

[22] Indeed, the FPSAs were expressly "subject to mutually acceptable sponsored research agreements [SRAs] and receipt by Advisor from Company the necessary resources and authority to pursue IP and R&D programs recommended by the Advisor."

58.     The conduct outlined above and elsewhere herein violated not only the agreements themselves, but BBC's duties of good faith and fair dealing in connection with those agreements.

59.     Justifiably disturbed by BBC's false and wrongful accusations that they had breached the agreements, and the improper termination of those agreements based upon false and trumped up reasons, Dr. Soo and Dr. Wu resigned from BBC's Board effective April 13, 2017. Dr. Ting also resigned from BBC's Scientific Advisory Board on April 13, 2017.

60.     The three Founders sent a letter to BBC's Board on April 13, 2017, stating:

> Dear BBC Board,
>
> This is to let you know that all three Founders have been unilaterally terminated by [Bruce] Stroever without cause and without a vote from the full board.
>
> Despite agreement of the board to have management discuss with the Founders the conduct of the next set of pivotal large animal studies, this has not happened, and the Founders have been kept in the dark.
>
> We do not agree with this manner of running the company from both a scientific and a corporate sense.
>
> Effective today, April 12, 2017, we (Ben and Chia) are resigning from the BBC Board —and all three of the Founders (Eric, Ben, and Chia) are resigning from the Scientific Advisory Board.
>
> Please take our information and publications off of the website.
>
> Eric, Ben, and Chia.

61.     BBC improperly and illegally terminated the FPSAs, effectively forcing the Founders out of their positions with the Company they had begun, invested in and nurtured for years, and that owed virtually its entire existence to the Founders' work and dedication.

62.     These events were the result of BBC's and the other Defendants' false and baseless allegations of misconduct, and material breaches of the FPSAs.  All of this was driven and caused by the improper and wrongful decisions and the misconduct of the Defendants.

63.     This mistreatment, breach of contract, and ultimately improper ouster of the Founders also removed what was and surely would have continued as the Founders' opposition to

MTFB's and its designees' domination, control, and mismanagement of the Company.  This wrongful conduct also paved the way for the eventual change-of-control transaction in June/July 2018, through which MTFB and Don Hankey and affiliates engineered an improper, flawed and unfair takeover of the Company by Don Hankey and his affiliates for pennies on the dollar and in the process materially diluted the Company's other minority stockholders.

64.     The removal of the Founders' vocal advocacy for integrity and transparency at BBC ensured that MTFB and Don Hankey and his affiliates Stockholders could freely effectuate their plan to transition control of the Company to Hankey and his affiliates with minimal, if any, director or stockholder opposition.

65.     The other Defendants' actions caused and/or aided in BBC's violation of the FPSAs and/or other implicit or explicit contracts, agreements or understandings with the Founders.

66.     The Defendants actions in breaching and/or causing the breach of the agreements with the Founders also ignored the directives of BBC's Code of Conduct and Ethics (the "Code"), the current version of which at least has been in effect since June 3, 2014.[23]  This Code, which appears currently on BBC's corporate website to the present day, was "adopted by the Board" and is by its terms applicable "to all directors, officers, full and part time employees, temporary workers, contract workers and consultants."  The Code further provides "[c]ompliance with applicable laws and this Code is of the highest importance" and "[c]ompliance with this Code is the responsibility of each covered individual . . .."[24]

67.     The spirit and the letter of the Code were tossed aside by the Defendants in connection with their misconduct relating to the Founders and the Founders' agreements with the

---

[23]     http://bonebiologics.com/wp-content/uploads/2016/04/BONE-BIOLOGICS-CODE-OF-CONDUCT-AND-ETHICS.pdf (l.v. July 9, 2019).

[24] *Id.* at pp. 2-3 (l.v. July 9, 2019).

Company.

68.     The Defendants participated in, approved and/or permitted the wrongs alleged herein to occur, including the breach of contract by BBC, and further participated in efforts to obfuscate, conceal and/or disguise those wrongs.

69.     For these and other reasons, as set forth above, BBC breached its agreements with the Founders, including the Plaintiffs herein.

70.     Accordingly, Plaintiffs seek relief for the harm they have suffered in the form of money damages, injunctive and/or other appropriate relief as a result of the violations and other misconduct alleged herein.

## COUNT I
## BREACH OF CONTRACT AGAINST BBC

71.      Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

72.     As set forth herein, valid and binding agreements existed between Plaintiffs, the Founders, and BBC.

73.     BBC's conduct as described herein caused it to be in breach of said agreements between it and the Plaintiffs.

74.      Plaintiffs performed all conditions, covenants, and promises required by them on their part to be performed in accordance with the terms and conditions of these contracts.

75.     As a direct and proximate result of BBC's breach of these agreements, Plaintiffs suffered damages in exact amounts to be determined, but in excess of $75,000.

## COUNT II
## TORTIOUS INTERFERENCE WITH CONTRACT AGAINST MTFB, LANEVE, STROEVER, and BOOTH.

76.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

77.    BBC was bound by several agreements with each of the Founders, as described herein.

78.    The Defendants identified above knowingly interfered with these contracts by inhibiting and ultimately preventing BBC's performance thereof, by causing and/or substantially assisting in BBC's termination of those contracts, in breach of the terms of those contracts, as set forth herein.

79.    This interference, in addition to being intentional, was improper in motive or means, as set forth herein.

80.    The Plaintiffs were substantially harmed by these Defendants' actions.

## JURY DEMAND

81.    Plaintiffs hereby demand a trial by jury as to all claims so triable.

WHEREFORE, Plaintiffs pray for:

(a)    Damages in an amount to be proven at trial;

(b)    Punitive damages;

(c)    Reasonable attorneys' fees according to proof;

(d)    Costs of suit herein incurred; and

(e)    Such other and further relief as the court may deem proper.

July 11, 2019

**PLAINTIFFS DR. BESSIE (CHIA) SOO
and DR. KANG (ERIC) TING**

By Their Attorneys,


/s/ Kimberly A. Dougherty
Kimberly A. Dougherty, Esq.
BBO# 658014
Lisa Lee, Esq.
BBO# 684631
**ANDRUS WAGSTAFF, PC**
19 Belmont Street
South Easton, MA 02375
Direct:  (508) 230-2700
Toll Free:  (866) 795-9529
Facsimile:  (303) 376-6361
E-mail:  kim.dougherty@andruswagstaff.com
E-mail: lisa.lee@andruswagstaff.com

and

**MILBERG PHILLIPS GROSSMAN LLP**
Kent A. Bronson*
One Pennsylvania Plaza, Suite 1920
New York, New York 10119-0164
Telephone:  (212) 594-5300
Facsimile:  (212) 868-1229
E-mail:  kbronson@milberg.com


*Pro hac vice application to be filed.