UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DR. BESSIE (CHIA) SOO and DR. KANG (ERIC) TING, | * * * | |
| Plaintiffs, | * * | |
| v. | * * | |
| BONE BIOLOGICS CORPORATION, a Delaware corporation, BRUCE STROEVER, an individual, JOHN BOOTH, an individual, STEPHEN LANEVE, an individual, and MTF BIOLOGICS (f/k/a THE MUSCULOSKELETAL TRANSPLANT FOUNDATION, INC.), a District of Columbia non-profit corporation, | * * * * * * * * | Civil Action No. 1:19-cv-11520-ADB |
| Defendants. | * * | |

## **MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS**

BURROUGHS, D.J.

Plaintiffs Dr. Bessie (Chia) Soo and Dr. Kang (Eric) Ting (collectively, "Plaintiffs")

brought this action against Bone Biologics Corporation ("Bone"), individuals Bruce Stroever,

John Booth, and Stephen LaNeve (collectively, "Individual Defendants"), and MTF Biologics

("MTFB") alleging breach of contract against Bone (Count I) and tortious interference with

contract against the Individual Defendants and MTFB (Count II). [ECF No. 1 ("Compl.") at 26–

27]. Presently before the Court are Defendants' motions to dismiss. [ECF Nos. 9 (MTFB), 11

(Individual Defendants), 13 (Bone)]. For the reasons set forth below, the motions to dismiss,

[ECF Nos. 9, 11, 13], are <u>GRANTED</u> without prejudice.

I.      **BACKGROUND**

A.      **Factual Background**

Bone is an early-stage biotech startup company, incorporated in Delaware and authorized to conduct business in Massachusetts.  [Compl. ¶¶ 7, 13].  MTFB is a non-profit tissue bank that owns approximately thirty-five percent equity in Bone and is a "strategic partner" actively involved in the company's management.  [Id. ¶ 11].  The Individual Defendants are all members of Bone's Board of Directors, designated by MTFB.  [Id. ¶¶ 8–10].

Plaintiffs, professors at the University of California, Los Angeles ("UCLA"), founded Bone, [Compl. ¶¶ 5, 6, 13], and held positions at the company from 2014 until early 2017, [id. ¶¶ 5, 6].  Dr. Soo was a member of Bone's Board of Directors and Dr. Ting was a member of its Scientific Advisory Board.  [Id.].  Plaintiffs helped to develop Bone's flagship product, NELL-1, a "recombinant human protein growth factor" used for bone regeneration.  [Id. ¶¶ 5, 6, 13, 14].  Bone has exclusive license to NELL-1 patent technology which it obtained from the UCLA Technology Development Group.  [Id. ¶ 15].  This patent technology accounts for most of the company's value.  [Id. ¶¶ 18–19].

On January 8, 2016, Plaintiffs entered into separate, but identical, Founders Professional Services Agreements ("FPSAs") with Bone.  [Compl. ¶ 23; ECF No. 18-2 at 2–9; ECF No. 18-3].  The FPSAs offered the Plaintiffs ten-year stock options which were scheduled to vest in annual increments, and a consulting fee.  [Compl. ¶¶ 23, 26; ECF No. 18-2 at 2].  In exchange, the Plaintiffs agreed to provide certain services to Bone to facilitate the growth and performance of NELL-1, including long-term intellectual property ("IP") strategy advising, patent term extensions and adjustments, and building R&D programs.  [Compl. ¶¶ 24–25; ECF No. 18-2 at 31].

In 2016, Plaintiffs became concerned about the management of Bone.  [Compl. ¶ 34].

Plaintiffs allege that Bone, through the Individual Defendants and at the behest of MTFB,

blocked their access to material data and information about NELL-1's progress.  [Id. ¶¶ 29–34].

The Plaintiffs claim that this lack of transparency and mismanagement effectively prevented

them from completing their work.  [Id. ¶¶ 31, 33].  In a string of emails sent between October

and December of 2016, the Plaintiffs expressed their discontent directly to Bone's Board of

Directors.  [Id. ¶¶ 35, 37, 41, 44].

The tensions between Plaintiffs and the Defendants culminated when Steve LaNeve,

Bone's Director and a designee of MTFB, allegedly told the Plaintiffs that delivery of their

services under their respective FPSAs was "eleven months overdue."  [Compl. ¶¶ 39–40].  On

December 13, 2016, LaNeve notified Plaintiffs that their FPSAs would be terminated effective

January 12, 2017, [id. ¶ 45; ECF No. 18-3 at 2], as "a result of [their] failure to provide [Bone]

with evidence that the [s]ervices [in the FPSAs] were rendered," [ECF No. 18-3 at 2]; see also

[Compl. ¶ 54].  Plaintiffs responded that the deadline was manufactured to retaliate against them

for complaining about Bone's mismanagement, and that they had in fact "been very active in

[their] own scientific activities."  [Compl. ¶¶ 42–44].  Plaintiffs believe that the termination of

the FPSAs was part of Defendants' scheme to engineer an improper takeover of the company.

[Id. ¶¶ 63–64].  Though Plaintiffs reached out to the Defendants "in hopes of resolving [their]

termination] on a fair and reasonable basis" their FPSAs were terminated effective April 8, 2017.

[Compl. ¶ 49].

The Plaintiffs then resigned from their positions on Bone's Board of Directors and

Scientific Advisory Board, respectively, on April 13, 2017.  [Compl. ¶¶ 59–60].  Plaintiffs

maintain that the termination of their FPSAs was "wrong . . . both in fact and in principle" and

that any shortfall on their work was a result of Bone's failure to provide the "necessary resources to conduct and accomplish it in the first place." [ECF Nos. 54, 56].

### B.    Procedural Background

On July 11, 2019, Plaintiffs filed the instant complaint against Bone, the Individual Defendants, and MTFB.  [Compl.].  Defendants moved to dismiss the complaint on November 14, 2019.  [ECF Nos. 9 (MTFB motion), 11 (Individual Defendants motion), 13 (Bone motion)].  Plaintiffs opposed the motions on January 23, 2020.  [ECF Nos. 16 (as to Individual Defendants and MTFB), 17 (as to Bone)].

## II.    LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff.  See Gilbert v. City of Chicopee, 915 F.3d 74, 80 (1st Cir. 2019).  "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (quoting Centro Médico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005)).  The alleged facts must be sufficient to "state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability."  Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial

4

experience and common sense.'" Id. at 44 (quoting Iqbal, 556 U.S. at 679). "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011)). "The plausibility standard invites a two-step pavane." A.G. v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (citing Grajales, 682 F.3d at 45). First, the Court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). Secondly, the Court "must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Morales-Cruz, 676 F.3d at 224).

III.    **DISCUSSION**

    A.    **Delaware Law Applies to All Claims**

As a preliminary matter, there is some confusion amongst the parties as to which state's substantive law applies to this case. [ECF No. 10 at 4–5 n.4; ECF No. 17 at 14 n.15]. In a diversity action, the Court applies the choice of law rules of the forum state, in this case Massachusetts. Aspect Software, Inc. v. Barnett, 787 F. Supp. 2d 118, 125 (D. Mass. 2011) (citing Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). As a general rule, Massachusetts courts will uphold a choice of law clause agreed upon by the parties in a contract. Morris v. Watsco, Inc., 433 N.E.2d 886, 888 (Mass. 1982) ("Massachusetts law has recognized, within reason, the right of the parties to a transaction to select the law governing their relationship."). However, "Massachusetts courts will not honor the parties' choice-of-law if the application of that provision: '[1] would be contrary to a fundamental policy of a state; which has [2] a materially greater interest than the chosen state in the determination of the particular issue;

and which . . . [3] would be the state of the applicable law in the absence of an effective choice of law by the parties.'" Optos, Inc. v. Topcon Med. Sys., Inc., 777 F. Supp. 2d 217, 229 (D. Mass. 2011) (quoting Restatement (Second) of Conflict of Law § 187(2)(b) (1971)).

The FPSAs contain identical choice of law provisions that mandate the application of Delaware state law "in all respects" to the contracts.  [ECF No. 18-2 at 7].  When parties use "embracing language" in contract provisions, these clauses should be "construed broadly" because the scope of the language reflects the intent of the parties.  Huffington v. T.C. Group, LLC, 637 F.3d 18, 21–23 (1st Cir. 2011) (contrasting narrow phrasing such as "to enforce" or "to construe" with broader phrasing like "with respect to" regarding the coverage of a forum selection clause).  Because the FPSAs state that Delaware law should apply "in all respects," the choice of law provision should be construed broadly.  Therefore, the breach of contract claim, which directly implicates the FPSA, must be adjudicated using Delaware law.  Although MTFB and the Individual Defendants are not parties to the contract, the claims arise out of their relationship to the terms in the FPSAs, putting the contracts directly at issue and triggering the choice of law provision.  [Compl. ¶ 78; ECF No. 18-2 at 2].[1]

---

[1] Even if the Court were to consider the choice of law test set forth in Optos, the conclusion would be the same, Optos, Inc. v. Topcon Med. Sys., Inc., 777 F. Supp. 2d 217, 229 (D. Mass. 2011), because Delaware's substantive law would apply in the absence of the choice of law provision, Aspect Software, Inc. v. Barnett, 787 F. Supp. 2d 118, 125 (D. Mass. 2011).  In Bushkin Associates, Inc. v. Raytheon Company, the Supreme Judicial Court held that, in the absence of a choice of law clause, Massachusetts courts should adopt a "functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole."  473 N.E.2d 662, 668 (Mass. 1985).  The goal of this approach is to apply the law of the state that has the most "significant relationship" to the parties.  Robidoux v. Muholland, 642 F.3d 20, 22 (1st Cir. 2011).  Because Bone is a Delaware corporation and the FPSAs that give rise to these claims were entered into under Delaware law, Delaware's corporate laws and policies are properly applied to the issue.  Therefore, the Restatement factors suggests that, even in the absence of a choice of law provision, the Court should apply the substantive law of Delaware.  See Aspect, 787 F. Supp. 2d at 127; [Compl. ¶¶ 7, 11].

A.       **Contract Claims Against Bone (Count I)**

1.       Breach of Contract

Plaintiffs allege that Bone violated the terms of the FPSAs by terminating them without cause and depriving them of the benefits of ten years' worth of stock options.  [Compl. ¶¶ 23, 60, 71–75].  Under Delaware law, proof of a breach of contract requires (1) the existence of a contract; (2) the breach of an obligation imposed by that contract; and (3) damages resulting from the breach.  Wenske v. Blue Bell Creameries, Inc., No. 17-cv-0699, 2018 WL 3337531, at *9 (Del. Ch. July 6, 2018).  In this case, Bone only contests the second element, arguing that Plaintiffs fail to allege a valid breach of the contract because "[a]ll of the events . . . allege[d] in the Complaint are consistent with a rightful, permissible termination of" the FPSAs.  [ECF No. 14 at 3].

To support the claim that the Defendants breached their obligations under the FPSAs, Plaintiffs must plead facts sufficient to establish that Bone's actions rose to "more than [a] mere default," but rather constituted a material breach of the contract.  DeMarie v. Neff, No. 2077-S, 2005 WL 89403, at *4 (Del. Ch. Jan. 12, 2005) (quoting 14 Williston On Contracts § 43:15 (4th ed. 2004)).  "A material breach is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract."  eCommerce Indus., Inc. v. MWA Intel., Inc., No. 7471, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013) (internal quotation marks omitted).  In essence, a breach is material if the breaching party fails to perform a substantial part of the contract.  Shore Inves., Inc. v. Bhole, Inc., No. S09C–09–013, 2011 WL 5967253, at *5 (Del. Super. Ct. Nov. 28, 2011) (citing 23 Williston on Contracts § 63:3 (4th ed.)).

According to the FPSAs, the Plaintiffs were to be paid for their services with a ten-year "stock option" of shares scheduled to vest in annual installments.  [ECF No. 18-2 at 2].  The contract could be terminated by either party at any time, either for cause, under Section 3(b)(i), or without cause, under Section 3(b)(ii).  [Id. at 3–4].  In the event of termination, the FPSAs detailed a payout scheme for how any remaining stock option shares would vest to the Plaintiffs.  [Id. at 2–3].  If Bone terminated the contract for cause, then any of the Plaintiff's remaining shares would be forfeited.  [Id. at 2].  If, however, Bone terminated the contract without cause, the remaining shares would vest immediately.  [Id. at 3].

Plaintiffs allege that they were terminated without cause and that Bone therefore breached the FSPAs by refusing to vest the remainder of Plaintiffs' shares.  [ECF No. 17 at 10].  Bone contends that Plaintiffs were terminated for cause in accordance with the termination procedures directed by the FSPAs.  [ECF No. 14 at 3].  Because Bone does not dispute that it did not issue any additional payments to the Plaintiffs upon termination, [ ECF No. 18-3], the claim rests on whether there are sufficient facts in the complaint to establish that Bone terminated the FPSAs without cause.

In Section 3(b)(iii), the FPSA clearly defines the possible ways the agreement could be terminated for cause:

> (a) A material breach by [Plaintiffs] of this Agreement which is not cured within thirty (30) days after written notice by [Bone] setting forth the nature of such alleged breach;
>
> (b) Acts or omissions constituting gross negligence, recklessness or willful misconduct which cause material harm to [Bone];
>
> (c) The disregard of written policies of [Bone] which cause damage or injury to the property or reputation of [Bone] which, if capable of cure, is not cured within thirty (30) days after written notice thereof by [Bone];

(d) [Plaintiffs] [are] indicted of, or convicted of, or admit, plea bargain, enter a plea of no contest or nolo contendere to, any felony of any kind or a misdemeanor involving fraud or dishonesty; and

(e) [Plaintiffs'] failure to render the Services or to accomplish those particular Services and objectives expressly identified as (1) in Ex. 3 attached hereto.

[ECF 18-2 at 4].  Plaintiffs do not contest the meaning of the terms, but rather claim that Bone "falsely asserted" that Plaintiffs breached the FPSAs to justify their terminations for "cause." [ECF No. 17 at 12].  Plaintiffs further assert that Bone did not provide the required thirty days' notice before effectuating termination of the FPSAs, and that the underlying alleged "breach" prompting their termination was based on Bone's own failure to fulfill their obligations under the contract.  [ECF No. 17 at 12].

As a preliminary matter, the Court rejects the claim that Bone did not provide sufficient notice of termination under Section 3(b)(iii)(a).  [Compl. ¶¶ 45, 49; ECF No. 17 at 12].  It is clear from the termination letter included in the complaint that Bone notified the Plaintiffs of their alleged breach of the FPSAs on December 13, 2016 and told them that the termination would be effective, unless the breaches were cured, on January 12, 2017, which provided the Plaintiffs with the requisite thirty days' notice.  [Compl. ¶ 45].

Plaintiffs argue that, even if the notice was sufficient, there was no "material breach" that justified their termination.  [Compl. ¶¶ 54–57]; see [ECF No. 18-2 at 31–32].  In the termination letter, Bone informed the Plaintiffs that they had materially breached the FPSAs "as a result of [their] failure to provide [Bone] with evidence that the [s]ervices (in particular those [s]ervices set forth in Exhibit 3, Section 1 of the [FPSA]) were rendered . . . ."  [ECF No. 18-3].  Section 1 of Exhibit 3 provides

The [Plaintiffs] will render services supporting and advising [Bone] with respect to the following initiatives:

> Long term IP strategy, including providing input on IP/Patent approach – Patent Term Extension (PTE), Patent Term Adjustment (PTA), New Filings; guiding [Bone's] R&D focus, drive R&D direction, and build R&D programs (subject to mutually acceptable sponsored research agreements and receipt by [Plaintiffs] from [Bone] the necessary resources and authority to pursue IP and R&D programs recommended by the [Plaintiffs]) to produce patent applications that if awarded will extend patent life of NELL-1 by at least 12 years; improve NELL-1 performance that if produced/purified/delivered properly by GMP protein contractor can increased Nell-1 half life by 25% over current Nell-1 patents set to expire in 2019, and work closely with Company patent counsel to build a robust IP "wall" around [Bone's] product portfolio.

[ECF No. 18-2 at 31].  The section's language is unambiguous: the Plaintiffs were to be paid in exchange for services related to developing the IP and guiding the R&D of Bone's signature product, NELL-1.  [ECF No. 18-2 at 2, 31].  To contest Bone's claimed reason for terminating the FPSAs, the Plaintiffs need to plead specific facts to show they completed, or at least attempted to complete, their contractual obligations.

As written, the complaint does not allege any facts to establish that Plaintiffs performed the services under the contract.  See generally [Compl.].  While the complaint is riddled with statements that Bone's claim of a material breach is "false," "baseless," and "improper," there are no specific details to bolster these conclusions or to establish that Plaintiffs did in fact satisfy their obligations under the contract.  [Id. ¶¶ 39, 59].  In an email sent on December 8, 2016, Dr. Ben Wu (not a party to this case) told the Bone Board that Plaintiffs "[had] been very active in [their] own scientific activities" despite the lack of support from Bone, yet there are no further facts describing these "activities" or establishing that they were related to NELL-1.  [Id. ¶ 44].

Plaintiffs argue that their work was not untimely because the FPSAs did not contain specific deadlines and that they were prevented from completing their work because Bone never provided the funding it promised.  [Compl. ¶¶ 55–56; ECF No. 18-2 at 31].  Plaintiffs do not, however, allege any facts to discredit Bone's claimed cause for terminating the FPSAs by saying

what work they did.  See generally [Compl.].  There is, in fact, nothing in the complaint to

suggest the Plaintiffs conducted the services promised under Exhibit 3, Section 1, and therefore

no allegations that adequately make out the elements of the offense or defeat Defendants'

contention that Defendants did not materially breach the contract.[2]  [ECF No. 18-2 at 31]; see

generally [Compl.].

Even assuming a breach of the contract based on Plaintiff's failure to share work that

they actually did with Bone in a timely manner, Plaintiffs could have cured the breach under the

terms of the contract, but they have also failed to plead facts sufficient to establish that they

made an effort to cure any such material breach during the allotted thirty days.  Plaintiffs merely

state that during the thirty days they "engaged in . . . discussions" with Bone "in the hopes of

resolving the situation."  [Compl. ¶ 46].  Beyond reference to these conversations, there are no

---

[2] In the complaint, Plaintiffs fall short of explicitly claiming that their performance of the
contract was "conditional" on Bone providing the sponsored research agreements ("SRAs") it
promised, but that is certainly the implication.  See [Compl. ¶¶ 41, 56; ECF No. 18-2 at 31].
Even if the Plaintiffs' performance was conditional, however, they were not relieved from their
obligation to perform the services under the FPSAs.  Delaware courts have held that,

> [w]here there has been a material failure of performance by one party to a contract,
> so that a condition precedent to the duty of the other party's performance has not
> occurred, the latter party has the choice to continue to perform under the contract
> or to cease to perform, and conduct indicating an intention to continue the contract
> in effect will constitute a conclusive election, in effect waiving the right to assert
> that the breach discharged any obligation to perform.

In re Mobilactive Media, LLC, No. 5725, 2013 WL 297950, at *14 (Del. Ch. January 25, 2013)
(quoting 14 Williston On Contracts § 43:15 (4th ed. 2004)).  Thus, even if Bone had materially
breached the FPSAs before Plaintiffs' performance was due, Plaintiffs waived their right to make
that argument by electing to remain in the contract rather than file a claim for breach of contract
when Bone balked on the SRAs.  See [Compl. ¶ 56; ECF No. 18-2 at 31].  Notwithstanding,
neither the complaint nor the opposition to the motion to dismiss sufficiently or directly make
this argument.  See generally [Compl.; ECF No. 17].

facts pled to show that Plaintiffs produced evidence of their work product, which presumably would have cured the breach.  [Id.].

In sum, Plaintiffs have not alleged facts to suggest that Bone improperly terminated the FPSAs for cause.  Bone adhered to the plain terms of the contract by notifying Plaintiffs of a material breach, and then giving Plaintiffs 30 days, the required amount of time, to cure the breach.  [ECF No. 18-2 at 2–3; ECF No. 18-3].  To dispute the "cause" aspect of the termination, Plaintiffs have to at least provide some evidence of their compliance with the contractual terms at issue beyond simply asserting that they performed under the contract.

2.      Violation of the Duty of Good Faith and Fair Dealing

Although not alleged as a separate count, Plaintiffs also claim that Bone violated its duties under the implied covenant of good faith and fair dealing.  [Compl. ¶ 58].  As a general practice, Delaware courts hold that the implied covenant of good faith and fair dealing is one of "limited reach" and should be used only as an "extraordinary legal remedy."  Nemec v. Shrader, 991 A.2d 1120, 1128 (Del. 2010); see also Superior Vision Serv., Inc. v. ReliaStar Life Ins. Co., No. 1668-N, 2006 WL 2521426, at *6 (Del. Ch. Aug. 25, 2006) ("[I]mposing an obligation on a contracting party through the covenant of good faith and fair dealing is a cautious enterprise and instances should be rare.").

Most notably for this case, Delaware courts have been clear that the covenant may not be used to "rebalanc[e] economic interests after events that could have been anticipated but were not, that later adversely affected one party to a contract."  In re CVR Refining, LP Unitholder Litig., C.A. No. 19-cv-0062, 2020 WL 506680, at *13 (Del. Ch. Jan. 31, 2020) (citation omitted); see also Aspen Advisors LLC v. United Artists Theatre Co., 861 A.2d 1251, 1260 (Del. 2004) ("[T]he court cannot read the contracts as also including an implied covenant to grant the

plaintiff additional unspecified rights . . . .  To do so would be to grant the plaintiffs, by judicial

fiat, contractual provisions that they failed to secure for themselves at the bargaining table.").

Plaintiffs list several instances of Bone's "bad faith" conduct that purportedly justify a claim for

breach of the implied covenant of good faith.  [ECF No. 17 at 16].  The Court concludes that the

covenant is not properly implicated in this case.

First, Delaware case law is explicit that the implied covenant of good faith is a limited

doctrine with limited application.  Nemec, 991 A.2d at 1128; Lonergan v. EPE Hldgs., LLC, 5

A.3d 1008, 1018 (Del. Ch. 2010).  The covenant applies only when the contract is "truly silent"

on the conduct at issue in the claim.  In re CVR Refining, 2020 WL 506680, at *13 (citation

omitted) (internal quotation marks omitted).  Delaware courts do, however, recognize that there

are "some aspects of [a] deal . . . so obvious to the participants . . . that they see no need [] to

address them."  Dieckman v. Regency GP LP, 155 A.3d 358, 368 (Del. 2017) (citation omitted)

(finding that it was implied in the express terms of a contract that members designated to an

"unaffiliated" committee, in the context of a conflict of interest between merging partnerships,

should be genuinely unaffiliated with partners and that deceptive practices giving the appearance

of independence were impermissible).  Even in cases where courts find it "reasonably

conceivable" that a defendant has breached the implied terms of a contract, there must be

sufficient facts as to the specific conduct that led to the breach.  In re CVR Refining, 2020 WL

506680, at *15–16.

Additionally, even if the Court were to agree with the Plaintiffs that the covenant is

properly implicated here, the Plaintiffs fail to meet the high standard for inferring that Bone

acted in bad faith.  See Allen v. Encore Energy Partners, L.P., 72 A.3d 93, 106 (Del. 2013).  To

establish that Bone acted in "bad faith," Plaintiffs must show either that Bone's actions were

"egregiously unreasonable" or "allege[] objective facts indicating that [their conduct] was not in the best interests" of the company.  Encore Energy, 72 A.3d at 108 (explaining that "without more" facts to show that defendants were "acting against [the company's] best interests," plaintiffs had not established that corporate directors were acting in bad faith merely because they may have  "negotiated poorly").  Plaintiffs cannot merely state that Bone conducted itself in "bad faith," without detailing how it acted contrary to the interests of the company.  If Plaintiffs had in fact failed to perform under the contract, Bone's response would not have been unreasonable, much less in bad faith.  Because Plaintiffs do not adequately plead that they did meet their contractual obligations, there is not enough here to support a finding of bad faith.

3.    Breach of the Bone Code of Conduct

Lastly, Plaintiffs claim that Bone's actions were in violation of Bone's Code of Conduct and Ethics ("the Code").  [Compl. ¶ 66].  Even relying on the Plaintiff's own description in the complaint, however, the language of the Code does not rise to the level of an enforceable contract under Delaware law.  Eagle Force Holdings, LLC v. Campbell, 187 A.3d 1209, 1212–13 (Del. 2018).  The Code states that it is a "general statement of expectations" to which company members "should adhere while acting on behalf of [Bone]," and its goal is to "set[] out basic guidance principles that [company members] should apply."  [Compl. ¶ 66 n.23].  The use of terms such as "should" does not indicate that company members were required to follow the Code or reflect an intent among parties to be bound to the terms of the Code.  Therefore, Plaintiffs have failed to establish that the Code is an enforceable contract.  See e.g., Hampshire Group, Ltd. v. Kuttner, No. 3607, 2010 WL 2739995, at *45 (Del. Ch. July 12, 2010) (finding

that an employee handbook was an enforceable contract because it contained "mandatory language").

Because Plaintiffs have failed to plead facts sufficient to establish that Defendant Bone breached its contracts with the Plaintiffs or the implied covenant of good faith and fair dealing, or that Bone's Code of Conduct is an actionable contract, the motion to dismiss, [ECF No. 13], is GRANTED as to Defendant Bone.

### B.    Tortious Interference Claims

Because Plaintiffs have failed to plead a breach of contract claim against Bone, their tortious interference claims as against the Individual Defendants and MTFB must also be dismissed.  "To state a tortious interference claim, a plaintiff must properly allege an underlying breach of contract."  Allied Capital Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020, 1036 (Del. Ch. 2006); see, e.g., Boyer v. Wilmington, No. 12549, 1997 WL 382979, at *10 (Del. Ch. June 27, 1997) (finding that because an underlying claim for breach of a shareholders agreement had failed, there was no basis for a tortious interference with contract claim).  Thus, because Plaintiffs have not alleged a valid underlying claim for breach of contract, the claims for tortious interference with a contract as against the Individual Defendants and MTFB fail. See Section III.A.1, supra.  In the interest of a full record, however, the Court considers the claims below and finds that, even if the breach of contract claim was properly alleged, the tortious interference claims would still fail.  See Section III.B.1–2, infra.

    1.    Tortious Interference (Count II) as Against the Individual Defendants

Plaintiffs allege that Stroever, Booth, and LaNeve, in their capacities as directors of Bone, fabricated breach of contract allegations against the Plaintiffs in order to give Bone a justification to terminate them for cause.  [Compl. ¶ 62].  Plaintiffs claim this alleged misconduct

by all three directors makes them individually and personally liable for tortious interference with a contract relationship.  [Id. ¶¶ 76–80].

To prevail on a claim for tortious interference with contract under Delaware law, a plaintiff must show "(1) there was a contract, (2) about which the particular defendant knew, (3) an intentional act that was a significant factor in causing the breach of contract, (4) the act was without justification, and (5) it caused injury." WaveDivision Holdings, LLC v. Highland Capital Management, L.P., 49 A.3d 1168, 1174 (Del. 2012) (citing Restatement (Second) of Torts § 766 (1979)).  "The most difficult aspect of the tortious interference analysis is the question of justification." NAMA Holdings, LLC v. Related WMC LLC, C.A. No. 7934, 2014 WL 6436647, at *28, (Del. Ch. Nov. 17, 2014).

Delaware state law recognizes a limited privilege for parties "affiliated through joint ownership [to] confer with respect to a contract to which one of them is party" in the good faith pursuit of legitimate profit seeking activities. Shearin v. E.F. Hutton Group, Inc., 652 A.2d 578, 591 (Del. Ch. 1994); see, e.g., In re CVR Refining, 2020 WL 506680, at *17 (noting that parent corporations in the "spirit of genuine economic competition" may properly interfere with contracts held by their subsidiaries to protect their economic interests).  This "affiliate privilege" reflects the reality that when two parties have a recognized relationship there is often a legitimate shared interest in consultation and intercession over contracts. See In re CVR Refining, 2020 WL 506680, at *17.  The privilege protects both affiliated entities and affiliated individuals. See, e.g., Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP, No. 18-cv-0372, 2019 WL 4927053, at *26 (Del. Ch. Oct. 7, 2019) ("Recognizing a limited affiliate privilege is consistent with the traditional respect accorded to the corporate form by Delaware law . . . in that it does not ignore that a parent and a subsidiary are separate entities.  Rather, it recognizes that

the close economic relationship of related entities requires enhanced latitude in defining what 'improper' interactions would be." (internal citations and quotation marks omitted)); Smith v. Hercules, Inc, No. 01C-08-291, 2002 WL 499817, at *3 (Del. Super. Ct. Mar. 28, 2002) (finding that company's CEO could not be held personally liable for actions taken in his capacity as CEO so long as the decisions he made "were business judgments relating to the operation of the company").

The affiliate privilege does not apply when a plaintiff alleges sufficient facts to show that the interfering party was "not pursuing in good faith the legitimate profit seeking activities of the affiliated enterprises," but was "motivated by some malicious or other bad faith purpose to injure the plaintiff." Renco Group, Inc. v. MacAndrews AMG Holdings LLC, No. 7668, 2015 WL 394011, at *9 (Del. Ch. Jan. 29, 2015) (citing Shearin, 652 A.2d at 591). To be protected by the privilege, individual defendants must act solely within the scope of their employment. See In re CVR Refining, 2020 WL 506680, at *17. Therefore, "an officer or director may be held personally liable for tortious interference with a contract of the corporation if, and only if, said officer or director exceeds the scope of his agency in so doing." Local Union 42 v. Absolute Envtl. Servs., Inc., 814 F. Supp. 392, 400 (D. Del. 1993).[3] Thus, for an individual defendant to be held liable on a tortious interference claim, the plaintiff must show that the individual was acting (1) with bad faith, and (2) outside the scope of their employment. See West v. Access Control Related Enters., LLC, No. N17C-11-137, 2019 WL 2385863, at *6 (Del. Super. Ct. June 5, 2019) ("[T]he [c]ourt notes that even if [d]efendants acted with bad motives, [d]efendants still

---

[3] The Delaware Court of Chancery has elaborated in dicta that public policy is best served when an individual acting out of their own "personal financial interest" is held liable, rather than the corporation, even when the individual's actions resulted in the corporation harming an innocent third party. See In re American Intern. Group, Inc., Consol. Derivative Litigation., 976 A.2d 872, 891 (Del. Ch. 2009).

could be acting within their scope of authority." (citing <u>Kuroda v. SPJS Holdings, LLC</u>, 971 A.2d 872 (Del. Ch. 2009)).

The Court begins with the presumption that the Individual Defendants were acting in the legitimate economic interests of Bone.  <u>See, e.g.</u>, <u>Yu v. GSM Nation, LLC</u>, C.A. No. N17C-07-200, 2018 WL 2272708, at *15 (Del. Super. Ct. Apr. 24, 2018) ("The [c]ourt must determine whether [the plaintiff] has alleged facts to rebut the presumption that [the individual] was acting with the same legitimate economic interests as [the company], and instead acted in bad faith to injure [the plaintiff].")  In light of this presumption, there is a heavy burden on the plaintiff to prove that the affiliate privilege should not apply because the individual was acting in bad faith. <u>See</u> <u>PPL Corp. v. Riverstone Holdings LLC</u>, No. 18-cv-0868 2019 WL 5423306, at *13 (Del. Ch. 2019) ("[T]he test for holding a parent corporation liable for tortious interference ha[s] to be high or every-day consultation or direction between parent corporations and subsidiaries about contractual implementation would lead parents to be always brought into breach of contract cases." (quoting <u>Allied Cap. Corp. v. GC-Sun Holdings, L.P.</u>, 910 A.2d 1020, 1039 (Del. Ch. 2006)).

"Conclusory allegations that defendants acted for personal reasons and therefore exceeded the scope of their authority" are insufficient.  <u>Kuroda</u>, 971 A.2d at 885.  In <u>Nye v. University of Delaware</u>, the court found the plaintiff pled facts sufficient to show that the individual defendants "acted beyond the scope of their employment by acting on personal, selfish or retaliatory motives rather than on behalf of the interests of the [u]niversity."  No. 02C-12-065, 2003 WL 22176412, at *7 (Del. Super. Ct. Sept. 17, 2003).  The complaint alleged that the university provost had directly threatened the plaintiff after the plaintiff was chosen over the provost to head a nine-million-dollar university grant program.  <u>Id.</u> at *2.  Additionally, the

plaintiff stated that the provost was in charge of appointing the members of plaintiff's evaluation committee and had used this position to circulate a petition among the committee members calling for a vote of no confidence in the plaintiff.  Id.  Finally, according to the complaint, the provost had appeared personally before the committee and demanded that the committee reject plaintiff's reappointment.  Id.

Here, the complaint contains scarcely any allegations against Defendants Stroever and Booth.  First, there are no specific claims that implicate Booth at all, beyond a description of his role as a director at Bone.  [Compl. ¶ 9].  Plaintiff's contention that all members of the Board of Directors must have been aware of and involved in the alleged wrongdoing because Bone is "a very small, early-stage biotech company," is conclusory and without factual support.  See [ECF No. 16 at 4].  Second, although Plaintiffs do specifically allege that Stroever made "hostile statements" and purportedly said that "he did not see how the founders could add value to [Bone]," [Compl. ¶ 41], these claims do not rise to the level of tortious interference.  See, e.g., Kuroda, 971 A.2d. at 880, 885 (dismissing plaintiff's tortious interference claims against individual defendants as conclusory when plaintiff alleged that defendants "(1) threatened [plaintiff] repeatedly with baseless legal claims; (2) caused the dissemination of false and misleading information . . . ; and (3) violated . . . their duties to [plaintiff] repeatedly while engaging in bad faith and unreasonable negotiating tactics" but did not "adequately allege that they exceeded the scope of their authority").  Without more specific allegations, the complaint does not support valid claims for tortious interference with a contract as against Stroever and Booth.

With regard to LaNeve, [Compl. ¶¶ 34, 36, 38, 39, 40, 42, 55, 56], the complaint alleges that he "concocted" an "11 month overdue deadline" that Plaintiffs failed to meet, and then used

this shortfall as grounds for a material breach of the FPSAs, [id. ¶¶ 40, 55].  Plaintiffs argue that

this deadline was fabricated, and further allege that it was LaNeve who prevented timely

completion of the Plaintiff's work by failing to provide them with the necessary resources

contracted for in the FPSAs.  [Id. ¶ 41; ECF No. 18-3 at 31].  Even if LaNeve did create this

arbitrary deadline, Plaintiffs must plead facts sufficient to suggest that LaNeve did so out of his

own personal motive, separate from the economic interests of Bone.  See, e.g., Smith, 2002 WL

499817, at *3 (finding that even though a CEO likely acted within the scope of his employment,

the plaintiff had pled sufficient facts against him for tortious interference because he stood

personally to gain from actions that resulted in an increase in the company's stock price).  The

only claim Plaintiffs make in this regard is that LaNeve "[a]mong other things" acted outside the

scope of his authority "by falsely claiming that the [Plaintiffs] had breached their contracts."

[ECF No. 16 at 6].

        First, it is not clear how LaNeve claiming that Plaintiffs had materially breached their

contracts would be outside the scope of LaNeve's authority as a director of Bone, even if the

allegations were ultimately false.  Second, Plaintiffs do not adequately connect LaNeve's

allegedly false statements to his own personal gain.  See generally [Compl.].  The only allegation

that suggests a personal motive is that LaNeve may have acted as part of an "unfair takeover" of

Bone that led to a dilution of the minority stockholders.  [Id. ¶¶ 63–64].  Still, Plaintiffs do not

expressly claim that LaNeve was a part of the takeover, and instead merely state that the

takeover was supported by "affiliates."  [Id. ¶ 64].  Further, Plaintiffs do not maintain that

LaNeve stood to benefit personally from creating the eleven-month deadline.  See [id. ¶ 64].

Overall, Plaintiffs have not presented facts that adequately show LaNeve improperly interfered

with the FPSAs in bad faith or that he acted outside the scope of his authority as a director of Bone.[4]

2.      Tortious Interference (Count II) as Against MTFB

Because MTFB is a majority shareholder of Bone, appointed several of Bone's directors, and allegedly had significant control over Bone's management, generally, Plaintiffs allege that MTFB is equally liable for interfering with their performance under the FPSAs.  [Compl. ¶¶ 27, 76–80].  The gist of MTFB's motion to dismiss is that a shareholder cannot be held liable for the mismanagement of a corporation because Delaware law recognizes a "separation" between the ownership and control of a company to protect its shareholders.  Malone v. Brincat, 722 A.2d 5, 9 (Del. 1998).  Plaintiffs allege that MTFB's significant stake in Bone was so substantial that they should share liability for Bone's misconduct.  [Compl. ¶ 11].  Because "Delaware maintains a role for tortious interference with contract," even in a parent-subsidiary relationship, Plaintiffs

---

[4] In their opposition brief, Plaintiffs argue that a more developed factual record is required to assess a defendant's state of mind and to determine whether a defendant was acting within the scope of their employment, and thus neither of these issues can be properly resolved at the motion to dismiss stage.  [ECF No. 16 at 7, 8].  First, in regard to the state of mind question, Plaintiffs cite two Massachusetts cases to support the notion that state of mind cannot be determined at the motion to dismiss stage.  [ECF No. 16 at 7].  In addition to the fact that this Court is bound by the substantive law of Delaware, Section III.A., supra, neither case helps the Plaintiff's argument.  In both cases the court denied the motions to dismiss, not because state of mind cannot ever be properly assessed at the pleadings stage, but because both plaintiffs pled sufficient facts in their complaints to assert valid claims for tortious interference.  See Rodriguez v. Atrius Health, Inc., No. 1984-cv-00251, 2019 WL 3205799, at *1 (Mass. Super. Ct. June 18, 2019) ("The facts alleged by [plaintiff] plausibly suggest that the three individual [d]efendants deliberately conspired to retaliate against her for reporting questionable medical care and billing practices, and thus meet the pleading requirements for alleging actual malice."); Fraelick v. PerkettPR, Inc., 989 N.E.2d 517, 525 (Mass. App. Ct. 2013) (allowing a tortious interference claim to continue to discovery because the plaintiff had already pled sufficient facts to show that the defendant, a corporate officer, had retaliated against the plaintiff employee).

argue that MTFB, as a "controlling entit[y]," [ECF No. 16 at 10 (citing <u>NAMA Holdings</u>, 2014 WL 6436647, at *26)], cannot be shielded from liability.

If Plaintiffs seek to hold MTFB liable as a controlling entity, however, then MTFB may be protected by the affiliate privilege, and may therefore only be held liable if it was acting in its own interest outside the scope of its authority.  Plaintiffs contend that MTFB is closely affiliated enough to Bone that the corporate separateness principle does not apply, and yet also distinct enough from Bone to circumvent the affiliate privilege.  <u>See</u> <u>Malone</u>, 722 A.2d at 9; <u>Shearin</u>, 652 A.2d at 591.  Plaintiffs must therefore establish that MTFB does not qualify for the affiliate privilege because it acted outside of its shared economic interest with Bone.  <u>See, e.g.</u>, <u>James Cable, LLC v. Millenium Digit. Media Sys., LLC</u>, No. 3637, 2009 WL 1638634, at *5 (Del. Ch. June 11, 2009) (granting a motion to dismiss tortious interference with contract claim because "[plaintiff] [did] not sufficiently allege any purpose behind [defendant's] actions outside of an economic interest. . . .  Accordingly, [defendant's] alleged actions . . . are protected by the affiliate privilege and are insufficient to state a claim for tortious interference with contractual relations").

Plaintiffs first claim that "[a]fter MTFB assumed its controlling position in [Bone]" the company's management was "rife with poor (even non-existent) corporate governance." [Compl. ¶ 27].  Most of the allegations in this vein involve actions of LaNeve, who Plaintiffs repeatedly state was an "MTFB-designee," which the Court has found insufficient.  [<u>Id.</u> ¶¶ 10, 39, 42].  Additionally, Plaintiffs have not alleged that MTFB's alleged control of access to material information about the progress of NELL-1 was motivated by malicious intent or bad faith.  For example, Plaintiffs state that "MTFB consistently refused to share with the [Plaintiffs] material information about the scientific progress of NELL-1." [<u>Id.</u> ¶ 28].  Elsewhere, Plaintiffs

say that "if anything [they were] provided with vague and incomplete access" to the material information.  [Id. ¶ 29].  These allegations are insufficient to establish that MTFB acted in bad faith and outside of the scope of its authority.

As with the claims against LaNeve, Plaintiffs maintain that MTFB may have acted in concert with others to "engineer[] an improper, flawed and unfair takeover" of Bone.  [Compl. ¶ 63].  Plaintiffs provide no further details or specifics, however, as to how MTFB specifically, not its designated Board members and not Bone, "engineered" such a takeover.  Such generalized and conclusory allegations are insufficient to plead that MTFB acted in bad faith and outside the scope of its authority such that it would not be protected by the affiliate privilege. Finally, none of the broad-based claims against MTFB—including "serious mismanagement," "inadequate follow-up response to [Plaintiffs'] concerns and inquiries," "false and baseless accusations," and "removal of the [Plaintiffs'] vocal advocacy"—go toward the requisite intent of bad faith and maliciousness required to show a valid claim of tortious interference with contract.  [Compl. ¶¶ 27, 29, 64]; see Shearin 652 A.2d at 591.  Nothing in the complaint other than the general statement that MTFB's motive was "improper" demonstrates that MTFB was ever motivated by anything other than its economic stake in Bone.  [Compl. ¶ 79]; see James Cable, 2009 WL 1638634, at * 5.  Thus, even if the Court accepts that MTFB can be held liable in a contract action as a shareholder of a corporation, the facts alleged in the Plaintiffs' complaint are insufficient to overcome the affiliate privilege that allows MTFB to engage in legitimate business with Bone.

## IV.    CONCLUSION

Accordingly, Bone's motion to dismiss, [ECF No. 13], is GRANTED without prejudice, as Plaintiffs have failed to plead facts sufficient to establish that Bone breached the FPSAs.

Because the breach of contract claim fails, the tortious interference claims against the Individual Defendants and MTFB must also be dismissed.  Even if the Court were to consider the claims, however, Plaintiffs have failed to plead facts sufficient to overcome the affiliate privilege.  The Individual Defendants' motion, [ECF No. 11], and MTFB's motion, [ECF No. 9], are therefore <u>GRANTED</u> without prejudice.  Plaintiffs may file an amended complaint within 21 days, but are urged to consider this ruling in determining which, if any claims, can be re-pled to withstand a motion to dismiss.

**SO ORDERED.**

August 12, 2020                                              /s/ Allison D. Burroughs
                                                            ALLISON D. BURROUGHS
                                                            U.S. DISTRICT JUDGE