# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DR. BESSIE (CHIA) SOO and DR. KANG (ERIC) TING, | ) ) | |
| | ) | **CIVIL ACTION NO. 1:19-cv-11520-** |
| Plaintiffs, | ) | **ADB** |
| | ) | |
| v. | ) | **AMENDED COMPLAINT** |
| | ) | |
| BONE BIOLOGICS CORPORATION, a | ) | **JURY TRIAL DEMANDED** |
| Delaware corporation, BRUCE STROEVER, | ) | |
| an individual, JOHN BOOTH, an individual, | ) | |
| STEPHEN LANEVE, an individual, and | ) | |
| MTF BIOLOGICS (f/k/a THE | ) | |
| MUSCULOSKELETAL TRANSPLANT | ) | |
| FOUNDATION, INC.), a District of | ) | |
| Columbia non-profit corporation, | ) | |
| | ) | |
| Defendants. | ) | |

1.      Plaintiffs Dr. Bessie (Chia) Soo and Dr. Kang (Eric) Ting ("Plaintiffs"), by and through their counsel, submit this Complaint for claims of breach of contract and tortious interference with contract against Bone Biologics Corporation ("BBC" or the "Company") and Stephen LaNeve ("LaNeve"), a director and former senior executive of BBC. The allegations herein are based on personal knowledge as to Plaintiffs and their own acts, and on information and belief from investigation of counsel, including (among other things) review of public information such as BBC's filings with the United States Securities and Exchange Commission ("SEC"), press releases, news and analyst reports, information on BBC's website, and other matters of public record, as well as certain internal documents and communications.[1]

---

[1] All emphases herein are added unless otherwise indicated.

## JURISDICTION AND VENUE

2.      Plaintiffs proceed under federal diversity jurisdiction, 28 U.S.C. § 1332.  The parties are completely diverse in citizenship, and the amount in controversy exceeds $75,000.

3.      This Court has personal jurisdiction over the Defendants because BBC maintains and/or maintained principal executive offices in the Commonwealth of Massachusetts, BBC and/or the Defendant LaNeve transact and/or transacted business within this Commonwealth, and the wrongful conduct alleged herein took place within Massachusetts.  The exercise of jurisdiction by this Court is permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper pursuant to 28 U.S.C. § 1391(b), because, among other things, a material portion of events from which the claims set forth herein arose took place in this district.

## THE PARTIES

5.      Plaintiff Dr. Bessie (Chia) Soo, is a U.S. citizen and California resident, a Professor in the UCLA Department of Orthopedics, and Vice Chair for Research in the UCLA Division of Plastic and Reconstructive Surgery.  Dr. Soo graduated from UCLA *magna cum laude* with an degree in biology and from UCLA medical school in 1993, with election to the Alpha Omega Alpha national medical honor society.  She was certified by the American Board of Plastic Surgery in 2005 and became an American College of Surgeons Fellow in 2007.  Dr. Soo has authored over 100 peer-reviewed publications on musculoskeletal regeneration, cutaneous repair, and translational applications of stem cells, has invented numerous patents in the area of regenerative medicine and is an expert on large and small translational animal models for device, combination product, and drug development.  Dr. Soo is one of the world's foremost experts on the NELL-1 protein (described below), and co-founded BBC.  She was a BBC director from 2014 to 2017.

6.      Plaintiff Dr. Kang (Eric) Ting, a citizen of Taiwan, is the former Chair of the Orthodontics Section and Division of Growth & Development at UCLA's Dentistry School.  He

is an attending physician of the UCLA Craniofacial Team, the largest and top ranked specialty-collaborative center in the Western U.S.  He is a dual clinician-scientist with multiple National Institutes of Health (NIH) and American Association of Orthodontists Foundation fundings to develop NELL-1 in the context of therapy for craniofacial and orthopedic diseases.  He co-founded BBC and was on its Scientific Advisory Board from 2014-2017.  Dr. Ting and Dr. Soo are married. Dr. Ting travels in the U.S. on an O-1 Visa. When in the U.S. he resides primarily in California.

7.     At all times relevant hereto, BBC was and is a Delaware Corporation, authorized to do business and conducting business in the Commonwealth of Massachusetts, with a principal place of business at 2 Burlington Woods Drive, Suite 100, Burlington, Massachusetts 01803. Plaintiffs co-founded (with Dr. Benjamin Wu) BBC, an early-stage biotech startup company.[2]

8.     Defendant Stephen LaNeve ("LaNeve") is a director of BBC was designee to the Board by MTF Biologics (("MTFB"), f/k/a The Musculoskeletal Transplant Foundation, Inc.), a District of Columbia non-profit corporation.  Defendant LaNeve is a former employee of BBC, having served as its CEO and President from August 2015 until June 2019, and continuing on with the Company pursuant to an independent contractor agreement dated June 28, 2019.  LaNeve is also a director and co-founder of a BBC competitor company named SkelRegen LLC.  Upon information and belief, at all relevant times Defendant LaNeve was and is a Pennsylvania resident.

## FACTS AND BACKGROUND

9.     The Founders led and were responsible for the original discovery and development of NELL-1, BBC's flagship product.  NELL-1 is a recombinant human protein growth factor and

---

[2]          https://www.marketwatch.com/press-release/bone-biologics-corp-completes-merger-with-afh-acquisition-x-inc-2014-10-16 (l.v. Sept. 1, 2020).  The original founders are Dr. Soo, Dr. Ting, and Dr. Ben Wu, all of whom may be collectively referred to herein as the "Founders."  BBC's predecessor company Bone Biologics, Inc. was founded in 2004, and in 2014 formed BBC through a reverse merge with AFH Acquisition X, Inc.

a powerful and specific bone and cartilage reformation product that provides  regulation over skeletal tissue formation and stem cell differentiation during bone regeneration.  The Founders (including Plaintiffs) secured tens of millions of dollars in grants for the foundational  research into NELL-1, paving the way for its development, commercial potential, and for BBC's existence.

10.     NELL-1 is reportedly subject to numerous issued patents owned by University of California Regents ("UC Regents"), with more than 200 claims.  BBC has obtained (through technology transfer from the UCLA Technology Development Group ("TDG") on behalf of UC Regents) exclusive worldwide license to NELL-1 technology for domestic and international spinal fusion, osteoporosis, and trauma treatment, three multi-billion-dollar markets projected to grow significantly in the next half-decade or so.   Testing and evaluation of NELL-1 to date has reportedly been very positive and supportive of NELL-1's significant commercial potential.

11.     For example, BBC issued presentations in 2018/2019 highlighting NELL-1's the "Strong IP Barrier," exemplified by the extensive patent coverage referenced above.[3]  BBC's 2018 and 2019 Annual Reports tout its "intellectual property portfolio that includes exclusive, worldwide licenses from UCLA TDG which we believe constitute a formidable barrier to entry."[4]

12.     NELL-1 has been widely discussed in the scientific and medical media.  For example, in July 2018 NELL-1 was selected for the 2018 International Space Station Innovation Award in Biology and Medicine (Project Name: "Development of NELL-1 Bone-Growth

---

[3] Bone Biologics, Delivering Innovative Orthobiologics, Regenerative Medicine for Bone (2019) (at https://bonebiologicsps.blob.core.windows.net/media/2019/10/Bone-Bio-Investor-Deck.pdf ) (l.v. Sept. 1, 2020).

[4] BBC 2018 and 2019 Annual Reports (at pp. 9 and 9, respectively) (at https://www.sec.gov/Archives/edgar/data/1419554/000149315219004221/form10-k.htm ) (l.v. Sept. 1, 2020).

Systemic Therapy") after being featured in June 2018 in *Upward Magazine* (the "Magazine of the [International Space Station] National Lab)."[5]

**The Founders' Professional Services Agreements [FPSAs]**

13.     On January 8, 2016, each Founder entered into a separate but identical Professional Services Agreement ("FPSA") with BBC, granting each ten-year options (to vest in stages) to purchase 1,800,364 shares of BBC common stock (corresponding to about 4% of the BBC's outstanding common stock on a fully diluted basis).[6]  Beginning January 2017, BBC was also to pay an annual $200,000 consulting fee to each Founder in cash or stock (BBC's option).[7]

14.     Pursuant to the FPSAs,[8] the Founders were to provide certain services.  However, these services (and the Founders' obligations to perform) were pre-conditioned upon BBC first providing necessary foundational resources.  Exhibit 3 to the FPSAs provided, as follows:

> Description of Services
>
> Company understands that Advisor[[9]] is a full-time faculty member at UCLA, and that UCLA Policies prohibit faculty from participating in the marketing, promotion, or sales of Company's products or services. Accordingly, Advisor's Services contemplated under this Agreement shall not include the marketing, promotion, or sales of Company's products or services. **Over the term of this**

---

[5] "Building Bones – Testing a New Osteoporosis Therapy with Mice in Microgravity" June 2019 (at https://upward.iss-casis.org/building-bones/ ) (l.v. Sept. 1, 2020).

[6] These were to vest gradually over a period of several years, and in full immediately upon a change-of-control.    2016  Annual  Report  (p.  9)  (at  https://www.sec.gov/Archives/ edgar/data/1419554 /000149315216008297/form10-k.htm (l.v. Sept. 1, 2020) ("The shares subject to the Options will vest 25% on each of the first, second and third anniversary of the effective date and 12.5% on each of the fourth and fifth anniversary of the effective date. The options fully vest on a change of control of the Company, if the Company terminates the [FPSA] without cause or the Founder terminates the [FPSA] with cause.").

[7] In June 2016, BBC agreed to issue each Founder 10-year options for 33,105 shares of its common stock at an exercise price of $2.05 per share (aggregate fair value of $192,906) as an adjustment to the FPSAs.

[8] BBC Form 8-K dated Jan. 11, 2016 (at https://www.sec.gov/Archives/edgar/data/1419554/000149 31521 6006735/form8-k.htm ); Exhibit 10.1 thereto (at https://www.sec.gov/Archives/edgar/data/1419554/ 000149315216006735/ ex10-1.htm ) (l.v. Sept. 1, 2020).  A copy of Dr. Soo's FPSA is Exhibit 1 hereto.

[9] "Adviser" referred to the respective Founder party to that particular FPSA.

agreement, the Advisor will render services supporting and advising the Company with respect to the following initiatives:

1. Long term IP strategy, including providing input on IP/Patent approach – Patent Term Extension (PTE), Patent Term Adjustment (PTA), New Filings; guiding the Company's R&D focus, drive R&D direction, and build R&D programs (*subject to mutually acceptable sponsored research agreements [SRAs] and receipt by Advisor from Company the necessary resources and authority to pursue IP and R&D programs recommended by the Advisor*) to produce patent applications that if awarded will extend patent life of NELL-1 by at least 12 years; improve NELL-1 performance that if produced/purified/delivered properly by GMP protein contractor can increased Nell-1 half-life by 25% over current Nell-1 patents set to expire in 2019, and work closely with Company patent counsel to build a robust IP "wall" around the Company's product portfolio.

2. *Pursuant to one or more sponsored research agreements to be entered into with Company on or before Jan 15, 2016*, Advisor will support sponsored research services to be conducted on behalf of Company, concerning, among other things, basic NELL-1 characterization (e.g., bioactivity, mechanism of action, etc.), NELL-1 pipeline product work (e.g., chemical modification, targeted delivery, etc.), disease indication related work (e.g., materials, stem cells, diagnostics, wireless health continuous monitoring, etc.)

3. Review and implementation support of the third-party partner, which [BBC] contemplates will be Diosynth (Raleigh, NC), including protein synthesis proposal, extending from the NELL-1 molecule characterization/formulation to pre-production

4. Review data on toxicity, immunogenicity, carcinogenicity and reproductive testing per agency guidelines across potentially three divisions (device, biologics, drugs)

5. Review data on animal testing following the Boden Model and to potentially include sheep (outside the model)

6. Review data on lyophilization and final manufacturing/assembly including DRM processes and specifications

7. Review data on final kit configuration to include components (vials, syringes, diluents, cannula, etc.), inner and outer trays and cartons, ship/drop, temperature stress testing

8. Review data on Clinical, Regulatory and Reimbursement strategies for selected indication(s), and Advisor shall provide real-time product evaluation, including providing confidential feedback of product concepts before farming out to contract labs.

9. Company Advanced Development Program - Developing novel product concepts that maximize the growth in company valuation by identifying products concepts

and refining the product concepts to work synergistic with business development, IP strategy, regulatory timeline, manufacturing capability, marketing, and sales.

10. Company Acquisition Targets. Identification of [BBC] third party acquisition targets, and also contribute to the technical due diligence process of evaluating technologies that will build value for [BBC].

11. Recruiting SAB, KOL, and consultant team. Advisor will use his/her connections to support [BBC]'s recruitment of the most prominent scientists, visible clinicians, and productive consultants to support the growth of [BBC].

15.    Importantly, however, the Founders' work with respect to NELL-1 was not limited to their capacities as consultants to BBC as encapsulated by the FPSAs.  For example, the Founders, including Plaintiffs, were employed by UCLA (and had been for years) and were continuing to actively doing work and conduct research on NELL-1 in their separate and distinct capacities as such.  The FPSAs (and the Exhibits thereto) recognized this, and UC-Regents' had ownership rights to any work done using UCLA funding, resources or facilities.[10]

**BBC's Improper Termination and Breach of the FPSAs in Retaliation Against the Founders, Driven by Defendant LaNeve Acting in Bad Faith and Outside the Scope of his Authority**

16.    Following the 2014 reverse merger, MTFB remained the largest and controlling stockholder in the Company and designated most of the Board, and BBC's senior management. Afterward, the Company became saddled with serious mismanagement, poor-to-non-existent corporate governance, a serious lack of transparency, and ongoing internal strife.

---

[10] See, for example, Paragraph 6 of the FPSAs ("Intellectual Property") states: "The following rights and assignments set forth in this Section 6 are at all times subject to the UCLA Guidelines for Intellectual Property and Consulting, attached hereto as Exhibit 1, and the UCLA Addendum to Consulting Contract, attached hereto as Exhibit 2."

17.     As the situation worsened, the Founders grew increasingly concerned and complained to the rest of BBC's Board and management.  While the Founders sought constructive ways to remedy the situation, as a result their relationships with other Board members and Company management significantly deteriorated.

18.     BBC's management and MTFB consistently refused to share with the Founders material information about the scientific progress of NELL-1.  The Founders reasonably requested and expected access and information to allow them to monitor the scientific progress of NELL-1, a product they had discovered and developed.  Consistent with this, the Founders sought thorough and regular access to testing and other scientific data in connection with the development efforts surrounding NELL-1.  Accordingly, the Founders requested full access to this information in order to sufficiently monitor NELL-1's scientific progress, and in connection with their overall duties as Company directors, Advisory Board members and under the FPSAs.

19.     Rather than getting full access, however, the Founders found themselves unreasonably restricted  by BBC, its management, and other Board members from having access to or reviewing raw data or testing materials and other material information concerning NELL-1. The Founders were routinely denied such access, or (at most) given only vague, incomplete and inadequate information and follow-up in response to concerns and inquiries, and forced to rely on (at best) incomplete second- or third- hand reports that could not be sufficiently scrutinized or verified.  As a result, they became very concerned about data integrity and having their names and reputations tied to data and results they could not adequately review or verify.  This was of particular concern since the Founders were being expected to publicly represent BBC, its business, and NELL-1.  By fall 2016 this situation was continuing and if anything, worsening.

20.     The Founders also raised issues in 2016 concerning the overall performance of BBC's management, including Defendant LaNeve.  Defendant LaNeve's and BBC management's performance was subject to certain key performance indicators and, as stated in BBC's SEC filings, management's performance was tied "to a great extent upon the experience, abilities and continued services of" Defendant LaNeve.  However, the performance of Defendant LaNeve and BBC management was evaluated not just on internal management performance, but also on the ability to successfully raise adequate outside funding and investment for BBC's continued operations and scientific testing, and properly spending the money that the Company did have.

21.     Defendant LaNeve and BBC management overall were not at all successful in these key performance requirements, including both raising adequate additional outside capital and properly managing and applying the funds that the Company did have.  In addition to their complaints about mismanagement and lack of transparency, in 2016 the Founders were focusing on and harshly criticizing BBC management and Defendant LaNeve in particular for these performance failures.  These failures were being scrutinized and criticized by the Founders in 2016, at about the same time Defendant LaNeve abruptly and falsely started to claim that the Founders were in "breach" of the FPSAs in the fall of 2016.

22.     In late 2016, the Founders were pressing their concerns about the lack of transparency and making good faith efforts to try to reform the internal reporting system in order to alleviate mismanagement and lack of transparency issues.  As stated in minutes for a telephonic Board meeting on October 20, 2016 "Dr. Wu expressed concern that the Founders were not properly informed especially with science matters" and

> [a] discussion ensued regarding the dissemination of information.  The Board is not informed on a day-to-day basis but significant issues are communicated through Board calls.  Areas of science are addressed at bi-weekly science calls and at select Board meetings where summarized data is provided.  Mr. Coffin suggested an

outline of the format that would provide the acceptable quality and timing of information should be provided at the next Board meeting and requested that the Founders begin that process by providing their outline to management and [sic] be discussed at their next science call the following week.

23.     Dr. Wu then sent an email to the full Board on October 26, 2016 proposing changes

and improvement in scientific reporting formats and frequency for NELL-1 developments, stating:

Dear Board of Directors of Bone Biologics Corp:

We are submitting this proposed science reporting format at the request of Bruce Stroever, Chairman of the [Board]. *As discussed in multiple Board meetings, Board calls, committee calls, and individual discussions, we the founders have repeatedly voiced our concerns of being uninformed of business and science decisions made by management.* We are told that the management team needs significant freedom to independently operate on business decisions, and that we only need to know as much as other Board of Directors. We find this to be unsatisfactory with respect to business decisions that affect the founders directly and indirectly. Examples of undesirable consequences include the hiring scientific consultants, funding of needless scientific experiments that cost us time and money, and animal studies without proper scientific planning, could have been avoided if input from the founders were sought beforehand. We will keep this list short as they have already been presented to management and Board.

*More importantly, the science calls have been largely frustrating and ineffective as they have been overly simplistic and conveyed through intermediaries who did not perform the actual work. When we asked for details, very little additional information is available, and no insights are available as to the scientific thinking involved, and the hypothesis moving forward.* We are still waiting for answers to our questions on the Fuji data from June. *We discussed the proper format several times but there is clearly no improvement.* In response to the Board's recent request for proper reporting format in the science calls, we suggest the following.

Complete data should be submitted a full 48 hours before the call, with enough depth that we can discuss mechanisms and potential issues. The results should be summarized in PowerPoint, and the actual data should be provided in the original raw data format. Statistics, if used, should be justified. This allows BBC to have a collection of well justified scientific data that can be validated, analyzed, and fully understood. *Giving us the "readers digest" version is not acceptable, especially when the presenter cannot answer our questions, and cannot followup with the information after promising to do so.* A good start is to collect all the raw data and explanations that we have requested from the previous calls.

Direct communication between Founders and the Fuji team and any subcontractors must be the primary mode of reporting. *The consultants are great at presenting their slides, but they either cannot or refuse to answer our questions, and either cannot or will not get the answers from the source. We want to be able to ask the*

*questions in real time directly, since we understand the full context and rationale of our questions. Given the financial constraints the company faces, the need to terminate some/all consultants is looming.* When these consultants leave, it would take a lot of time and effort to re-compile the lost opportunity to gather the data as they come in, as a lot of information are currently completely hidden from founders. Therefore, allowing founders to interface directly with Fuji, in particular, will allow us to help BBC reduce cost, de-risk the loss of knowledge and time, and preserve the value for our investment. *The founders have the same obligations for confidentiality and certainly more loyalty to BBC than consultants who will leave the minute the funds run out. A good start is to schedule a meeting between the Fuji team and the founders, so that we can get an accurate assessment on the true status of protein manufacturing.*

*Scientific budget goes hand in hand with project management. Where did all the money go? We have raised quite a lot of money over the past year, but the latest term sheets at $1 conversion seems to suggest that company value has not increased. We don't know how we arrived at this state from the business side, but as we would like to have some insight and input into our scientific investments.* A good start is to show updated expenditure summary since 1/1/16 of all BBC scientific investments, detailing contractual fees, budget, breakdown and scope of work for consultants' scientific projects. This will allow us to help BBC track and prioritize current and future science investment when we raise more funds.

*We have waited patiently for management to improve the reporting system which has kept the founders at arm's length. This is not appropriate at best as it misrepresents a glaring problem to investors.* We sincerely hope that this suggest format can finally address our concerns of being excluded.

24.     Dr. Wu's email sparked indignation and resistance from BBC's non-Founder MTFB-designated directors and management, including Defendant LaNeve, who resisted, dissembled and claimed that Dr. Wu's proposal was somehow short on specifics, and tried to delay discussion to an unspecified future board meeting.

25.     The Founders' continued their efforts to solve the problems and improve the inadequate internal scientific reporting structure and information flow, but were met only with continued resistance and obfuscation.  A few days later on October 28, 2016 Dr. Soo sent a follow-up email to Defendant LaNeve addressing the problems again:

Re: science reporting

Hi Steve

Since the founders are scientists, we deal in facts. ***The fact is that despite repeated requests, we have not been able to engage with the people generating the primary raw data. We are given data second or third hand that we cannot verify adequately or interrogate directly.*** The fact is that on our Oct 26th, 2016 call with Bill Coffin and Bruce Stroever, Bruce flat out stated that he did not see how the founders possibly could help in commercial protein production or characterization. Although management may make statements about wanting to engage the founders, the factual reality is that this has not happened. The position articulated by Stroever sheds some light on why this has not happened.

On a separate topic of deferred founders' compensation for the initial founders' agreement from Sept 2015, Stroever stated that the initial founders' agreement signed in Sept 2015 had no basis in his opinion -- despite it being approved by the BBC [B]oard. Stroever said repeatedly on Oct 26th, 2016 call that the Founders were already paid through stock that they originally owned in the company and should not expect any additional payments. This sheds additional light on the delays in getting the contracts in place, and the fact that the contractual payouts have not been honored.

Overall, the hostile statements made by Stroever as chair of the BBC [B]oard and the actual lack of founder engagement by BBC management, make it clear that engaging the founders is just lip service. The founders have never been truly engaged, and now we know that it is management's mandate to exclude [them]. What Ben [is] asking for is completely reasonable given the state of the company.

26.     Defendant LaNeve never responded to Dr. Soo's October 28, 2016 email.  Instead, about three weeks later, he abruptly began to suggest that that the Founders' had breached the FPSAs.  On Friday, November 18, 2016, Defendant LaNeve sent an email to the Founders Plaintiffs requesting that they "provide me with soft copy / email documentation on the progress you have made against the BBC-UCLA Sponsored Research Agreement (SRA) and the prospective Professional Services Agreement (PSA) between each of the three of you and BBC.  I need this status update by close of business on Tuesday, November 22nd, '16" (four days later).

27.     Defendant LaNeve had apparently sent a hard copy of the same message to the Founders by FedEx, and when questioned about the sudden request and the basis for such an imminent deadline, he responded (by email) on November 20, 2016:

Chia, the FedEx is a hard copy that is the same as the email. As you know, we have 7 of 12 patents expiring in 2019 and this is a rate limiting factor for us in maximizing BBC value.

*I have no documented update on your collective work to modify NELL-1 in such a way that allows us [BBC] to file new C-o-M IP and have those changes either reduce cost to manufacture or improve performance in some way as we agreed in the PSA, exhibit #3 (effective 1/8/2016). . . .*

28.     Dr. Soo responded in a November 22, 2016 email stating:

 . . . your statement "I have no documented update on your collective work to modify NELL-1 in such a way that allows us to file new C-o-M IP and have those changes either reduce cost to manufacture or improve performance in some way as we agreed in the PSA, exhibit #3 (effective 1/8/2016)", is disingenuous and inaccurate.

First of all, *the company was supposed to negotiate a sponsored research agreement [SRA] with UCLA to get that work done (completely separate from the SRA for bioactivity testing and separate from the professional services agreement). As CEO, it should be clear to you that BBC never negotiated such an agreement or even provided any resources for such work to be performed, so for you to make the above statement and to ask for what we have accomplished, is frankly—disingenuous—and once again, highlights the lack of sincere engagement of the founders by the BBC management team that I had referred to in my 10-28-16 email to you.*

29.     Dr. Soo's November 22, 2016 email then listed several of the UCLA-owned patents that had been recently achieved and funded by other sources, such as separate grant monies obtained by Dr. Soo in connection with UCLA, and not by funding or SRAs provided/arranged by BBC. Importantly, this reflected work Dr. Soo would have performed irrespective of BBC and the FPSAs, and, while potentially beneficial to BBC, it was done apart from the services to be provided pursuant to the FPSAs. Specifically, Dr. Soo's November 22, 2016 email continued:

Second, despite never having an agreement from BBC with UCLA to perform such work, we have in fact filed several patents in 2015 and 2016 to improve the performance of NELL-1. These include a non provisional application on random conjugation of NELL-1 to improve bioactivity (set to expire in 2036) as well as a provisional one on bone tissue specific targeting of NELL-1 to decrease the NELL-1 dose needed (to decrease cost of goods) and to improve bioactivity (set to expire in 2037). We also filed a patent set to expire in 2037 for unmodified NELL-1 to

modify osteoblast and osteoclast number ratios—this patent if awarded may be very important to add patent life to any formulations using unmodified NELL-1.

Since you are the BBC CEO, I would expect you to communicate with UCLA so that you can communicate accurate information to the BBC board and to investors on what is a part of the NELL-1 portfolio at UCLA.

Lastly, I still have not gotten a response from you or Stroever with respect to my 10-28-16 email regarding: 1) the hostile statements made by Stroever as the chair of the BBC board that he did not see how the founders could add value to BBC and that he did not think founders should get paid and 2) the lack of sincere meaningful engagement of the founders by the BBC management team.

30.     In sum, the Founders disputed Defendant LaNeve's suggestion that they were in breach of the FPSAs.

31.     On December 6, 2016, BBC's CFO circulated draft minutes for a November 9, 2016 Board meeting (in which the Founders did not participate) containing false and misleading language about the Founders being "in breach" of the FPSAs:

Additional discussion ensued regarding the Founders Professional Services Agreement (PSA). If the Founders do not provide completed work product described in the PSA then the Founders would be in breach of the agreement and would be given the option to supply information on the work that they have been undertaking according to the contract terms.

32.     The Founders vigorously disputed this language and the assertion that they were or would be in breach under the circumstances. Dr. Wu sent a December 8, 2016 email to the Board addressing this language and accusations of breach:

Dear BBC Board,

Thank you for the draft minute[s].   I would appreciate an explanation for the statement: "If the Founders do not provide completed work product described in the PSA[11] then the Founders would be in breach of the agreement and would be given the option to supply information on the work that they have been undertaking according to the contract terms".   I repeat my 11/23/16 question to Steve that remains unanswered: ***Can you please point me to the due date that is 11 months overdue per the PSA?   First, the PSA was signed in Jan 2016 for a term of 5***

---

[11] "PSA" refers to the FPSAs.

*years. Second, the deliverable[s] were absolutely contingent upon the company providing the necessary resources to accomplish the deliverables. Third, there were no specific due dates for deliverables. Therefore, Steve's absurd statement that the founders were 11 months overdue is insupportable.*

*This random, poorly thought-out attack on the founders came after our 10/26/16 letter to the Board delineating our concerns with scientific and business management of the company, and after our call with Bruce Stroever and Bill Coffin where we questioned the management team's performance, inability to raise any significant funds beyond the insiders, poor science reporting, and lack of transparency. Then, Steve invents an 11-month overdue deadline, creates urgency, changes the rules after the fact, changes the due date, and will most likely serve as the judge and juror to determine if the founders are in breach. This constitutes a form of retaliation that is simply inconsistent with proper corporate governance.*

With respect to the SRA,[12] please clarify if the COI was the only obstacle towards developing an SRA that will allow the founders to carry out some of the deliverables described in the PSA. The COI issue was news to the Founders. Separately, it was our understanding from Bruce's email to the board that BBLG[13] funds would run out Oct 15, 2016. Subsequently, documents sent to the board suggest that the most recent $1.2M note requires winding down BBLG operations to complete existing ongoing studies and suspending [the FPSAs]. We were told by Bruce that the funds would support only protein manufacturing – and that the founders are not qualified to contribute in that process. This sudden change in interest to fund the SRA documented is in direct contrast with ALL prior written communications and previous board minutes that point to winding down. *Since the board minutes are the first time that we hear about starting new studies, how much funds are actually available for the SRA? Neither the change in company direction nor the amount of funds have been communicated to the founders, yet the draft minutes make it appear that BBLG is waiting for us to complete the SRA. Coincidentally, this abrupt U-turn occurs at the same time that Steve invents the 11-month overdue deadline. This surprise is certainly consistent with my 10/26/16 letter to the Board regarding our concerns of being uninformed of business and science decisions made by management. This retaliation adds to the inappropriate pattern of mismanagement and constitutes a glaring problem to investors.*

33.    Dr. Wu's email concluded by noting the scientific work the Founders had conducted in connection with NELL-1 in their separate capacities, *e.g.*, as UCLA scientists, distinct and apart from roles as BBC consultants:

---

[12] "SRA" refers to "sponsored research agreement."

[13] "BBLG" refers to BBC.

> *Despite these concerns, we have been very active in our own scientific activities and we are very are happy to supply information – after these questions are answered satisfactorily.*  Given the unprofessional and heavily biased manner that this is mismanaged, the Founders request an independent committee comprising of major shareholders to be involved in judging if the founders are indeed in breach. Steve is simply not qualified to handle this.  Several board members have requested a board meeting or board call.  On a side note, the draft minutes from the 11/9/16 board call contains incorrect information regarding the PSA and SRA that we can discuss then.
>
> Best Regards,
>
> Ben

34.     Five days later, on December 13, 2016, BBC informed the Founders by separate letters that it intended to terminate the FPSAs effective January 12, 2017, purportedly for "cause," absent cure of the supposed "breaches" before then.  The letters stated, in pertinent part:

> By way of this letter, the Company is hereby providing you with written notice that the Company is terminating the Agreement for cause pursuant to Section 3(b) of the Agreement as a result of your failure to provide the Company with evidence that the Services (*in particular those Services set forth in Exhibit 3, Section 1* of the Agreement) were rendered, as previously requested of you by the Company on November 24, 2016. Absent your cure of the foregoing material breach of the Agreement to the Company's reasonable satisfaction and consistent with the requirements under the Agreement, termination of the Agreement shall be effective on January 12, 2017.  According to our records, there are no outstanding payments owed to you under the Agreement, nor will any amounts become owed to you following the termination of the Agreement.

35.     Termination was subsequently delayed for several months while BBC and the Founders engaged in discussions in an attempt to resolve the dispute.  On or about March 23, 2017, and again on March 29, 2017, BBC's CFO circulated a draft 2016 Annual Report to the Board containing more false and inaccurate statements about BBC's termination of the FPSAs and the supposed "cause" to do so, claiming BBC "cause" existed based on the Founders' supposed failure to file patents for BBC, which was in fact not a breach under the terms of the FPSAs because Exhibit 2 provided a "pre-existing obligation to disclose and assign Patent rights to the University of California…," not BBC.  The recent patents achieved by the Founders had been achieved in

connection with their capacities and work done and as UCLA scientists, sponsored by or in connection with UCLA, not BBC, distinct from their roles and obligations as BBC consultants.

36.    The Founders refused to sign off on the final version of the 2016 Annual Report due to the false and incorrect statements in it accusing them of breaching the FPSAs.[14]  BBC then unfairly and improperly terminated the FPSAs effective April 8, 2017.  In doing so without proper cause or any cause at all, and refusing to compensate Plaintiffs, BBC breached the FPSAs.

37.    The FPSAs were terminated in retaliation for the Founders' complaints about mismanagement and transparency at BBC, including with respect to its scientific reporting and related processes.  BBC, itself and by and through Defendant LaNeve, acting in bad faith and outside the scope of his authority, falsely manufactured supposed FPSA "breaches" by the Founders to support a fictional claim for "cause" to terminate, solely in order to retaliate against the Founders, including the Plaintiffs herein.

38.    BBC's claim that the Founders failed to timely provide completed work product pursuant to the FPSAs, and were therefore in breach, was false, disingenuous, and wrong both in fact and in principle, for a number of reasons.

39.    First, the FPSAs did not contain or mandate any specific "deadline" by which the Founders were obligated to produce any "completed work product."  BBC and Defendant LaNeve manufactured a false "deadline" out of thin air to claim it was missed purely in order to falsely claim that the Founders had "violated" the FPSAs.  As Dr. Wu stated, "Steve [LaNeve] invent[ed] an 11 month overdue deadline, creates urgency, changes the rules after the fact, changes the due

---

[14] BBC's Annual Report and a Form 10-Q filed afterward stated that the FPSAs had been terminated for "cause" but failed to give any indication as to what this supposed "cause" was.  Justifiably disturbed by their continuing mistreatment and the improper termination of the FPSAs, Dr. Soo and Dr. Wu resigned from the Board, Dr. Ting resigned from the Scientific Advisory Board, effective April 13, 2017.

date, and will most likely serve as the judge and juror to determine if the founders are in breach. This constitutes a form of retaliation that is simply inconsistent with proper corporate governance."

40.    Additionally, the "completed work product" that BBC and LaNeve alleged had not been  timely delivered was fully contingent on BBC's providing necessary resources to conduct and accomplish it in the first place – resources the Company never secured or provided.  BBC never provided this, and/or provided insufficient "sponsorship," to conduct the work to begin with. Although the Defendants' failure to secure funding for the SRAs may ultimately constitute a breach of contract in itself, it additionally and importantly demonstrates the Defendants' misrepresentations regarding the Founders' performance under the FPSAs.

41.    As of the fall 2016, when BBC and Defendant LaNeve claimed that the Founders were in "breach," the Founders had not claimed and did not necessarily believe that BBC had "breached" by not yet providing the necessary SRAs and related resources or satisfying that pre-condition, because less than one year had passed since the effective date (January 8, 2016) of the five-year FPSAs, and because Exhibit 3, Item 1 of did not specify deadlines for SRAs relating to intellectual property strategy (or otherwise).  Therefore, at that point the Founders were awaiting BBC's provision of the SRAs, after which they fully expected to perform the services agreed to.

42.    Accordingly, the Founders did not in any way acquiesce in or "waive" any breach or failure to perform by BBC, and this is not a situation involving Plaintiffs somehow already enjoying fruits of the FPSAs (or BBC's performance thereunder) and then seeking to avoid their own obligations by belatedly raising a past breach by BBC.  Instead, Plaintiffs seek relief for BBC's breach of the contract as written:  BBC's termination of the agreement without cause and failure to pay the accelerated compensation in full which was due thereunder.

43.     The falsity and bad faith underlying BBC's and Defendant LaNeve's charges of breach against the Founders is demonstrated by the timing and circumstances here.  The FPSAs were dated in mid-January 2016.  If true, Defendant LaNeve's allegation that the Founders were "11 months" overdue in November 2016 meant that they would have been in breach within just a few weeks after the agreements had been executed.  This proposition is absurd on its face.

44.     This timing also demonstrates Defendant LaNeve's bad faith, in that these manufactured and baseless accusations of "breach" by the Founders came on the heels of, and obviously in retaliation for, the Founders' persistent complaints against BBC senior management (including Defendant LaNeve himself) and for mismanagement, lack of transparency, and poor performance.  By this conduct, BBC itself acted breach the FPSAs, and Defendant LaNeve's acted outside of the scope of his authority as a director and officer of BBC, and instead in his own personal interests, by accusing the Plaintiffs of breaching the FPSAs in order to terminate their consultancies without compensation and cause them harm in retaliation for their persistent criticism of BBC management, and Defendant LaNeve in particular.

45.     For these and other reasons, as set forth above, BBC breached the FPSAs with the Founders, including the Plaintiffs herein, by terminating the FPSAs without cause and failing to compensate the Plaintiffs under the FPSAs by immediately paying the compensation owed in full, as was required, and Defendant LaNeve acted in bad faith and outside of the scope of his authority in causing and aided and abetted BBC in doing so, tortuously interfering with those agreements.

46.     Under the circumstances, BBC's improper and illegal termination the FPSAs violated its duties of good faith and fair dealing implicit in those agreements.

47.     Plaintiffs seek relief for harm suffered in the form of money damages, injunctive and/or other appropriate relief resulting from the violations and other misconduct alleged herein.

## COUNT I
## BREACH OF CONTRACT AGAINST BBC

48.      Plaintiffs incorporate by reference and re-allege each and every allegation above, as though fully set forth herein.

49.      The FPSAs were valid and binding agreements between Plaintiffs and BBC.

50.      BBC's conduct as described herein caused it to be in breach of the FPSAs.

51.      Plaintiffs were in good standing vis-à-vis the FPSAs and performance of their obligations thereunder, and had satisfied and/or stood ready, willing and able to satisfy all conditions, covenants, and promises required in accordance with the terms and conditions of the FPSAs.  In addition, to the extent applicable, Defendants were fully aware that Plaintiffs stood ready, willing and able to perform under the FPSAs, including when BBC fulfilled the prerequisite and conditional obligations of providing SRAs, funding and/or other resources.

52.      As a direct and proximate result of BBC's breach of the FPSAs, Plaintiffs have suffered damages in exact amounts to be determined, but in excess of $75,000.

## COUNT II
## TORTIOUS INTERFERENCE WITH CONTRACT
## AGAINST DEFENDANT LANEVE

53.      Plaintiffs incorporate by reference and re-allege each and every allegation above, as though fully set forth herein.

54.      The FPSAs were valid and enforceable agreements between the parties thereto.

55.      Defendant LaNeve knowingly interfered with the FPSAs contracts by inhibiting and ultimately preventing BBC's performance thereof, by causing and/or substantially assisting in BBC's termination of the FPSAs, in breach of their terms, as set forth herein. Defendant LaNeve acted outside of the scope of his proper authority as a BBC officer and director, and also acted in bad faith and in his own personal interests, as set forth herein.

20

56.     This interference was intentional and improper in motive or means.

57.     The Plaintiffs were substantially harmed as a result of Defendant LaNeve's actions.

### JURY DEMAND

58.     Plaintiffs hereby demand a trial by jury as to all claims so triable.

WHEREFORE, Plaintiffs pray for:

(a)     Damages in an amount to be proven at trial;
(b)     Punitive damages;
(c)     Reasonable attorneys' fees according to proof;
(d)     Costs of suit herein incurred; and
(e)     Such other and further relief as the court may deem proper.

September 2, 2020

*PLAINTIFFS DR. BESSIE (CHIA) SOO and DR. KANG (ERIC) TING*

By Their Attorneys,

/s/ Kimberly A. Dougherty[15]
Kimberly A. Dougherty, Esq.
BBO# 658014
**ANDRUS WAGSTAFF, PC**
19 Belmont Street
South Easton, MA 02375
Ph:   (508) 230-2700
Fax: (303) 376-6361
kim.dougherty@andruswagstaff.com

and

**MILBERG PHILLIPS GROSSMAN LLP**
Kent A. Bronson (*Admitted pro hac vice)*
One Pennsylvania Plaza, Suite 1920
New York, New York 10119-0164
Telephone:  (212) 594-5300
Facsimile:  (212) 868-1229
E-mail:  kbronson@milberg.com

---

[15] Kimberly A. Dougherty is not the author of this filing and is solely filing this Amended Complaint as a professional courtesy for the Plaintiff at the request of, and on behalf of, lead counsel, Kent A. Bronson, who was not able to file the document at this time given their current ECF status.