UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DR. BESSIE (CHIA) SOO and DR. KANG (ERIC) TING, | * * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 19-cv-11520-ADB |
| BONE BIOLOGICS CORPORATION and STEPHEN LANEVE, | * * * | |
| Defendants. | * * * | |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS**

BURROUGHS, D.J.

Plaintiffs Dr. Bessie (Chia) Soo and Dr. Kang (Eric) Ting (together, "Plaintiffs") bring

this action against Defendants Bone Biologics Corporation (the "Company") and Stephen

LaNeve (together with the Company, "Defendants"), alleging that the Company breached its

contracts with them and that LaNeve tortiously interfered with those contracts.  [ECF No. 22

¶¶ 48–57 ("Am. Compl.")].  Currently before the Court is Defendants' motion to dismiss.  [ECF

No. 23].  For the reasons set forth below, Defendants' motion is <u>DENIED</u>.

I.      **BACKGROUND**

A.      **Factual Background**

For purposes of the instant motion to dismiss, the Court, as it must, "accept[s] as true all

well-pleaded facts alleged in the complaint and draw[s] all reasonable inferences therefrom in

the pleader's favor."  <u>A.G. ex rel. Maddox v. Elsevier, Inc.</u>, 732 F.3d 77, 80 (1st Cir. 2013)

(quoting <u>Santiago v. Puerto Rico</u>, 655 F.3d 61, 72 (1st Cir. 2011)).

Plaintiffs are doctors affiliated with UCLA.  [Am. Compl. ¶¶ 5–6].  With Dr. Benjamin Wu (together with Plaintiffs, the "Founders"), who is not a party to this litigation, Plaintiffs founded the Company, an early-stage biotech startup.[1]  [Id. ¶ 7].  From 2014 to 2017, Dr. Soo was one of the Company's directors, and Dr. Ting served on its Scientific Advisory Board.  [Id. ¶¶ 5–6].  LaNeve is one of the Company's directors and was its CEO from 2015 until 2019.  [Id. ¶ 8].

The Founders discovered and developed NELL-1, which is the Company's flagship product.  [Am. Compl. ¶ 9].  NELL-1 is a "recombinant human protein growth factor and a powerful and specific bone and cartilage reformation product that provides regulation over skeletal tissue formation and stem cell differentiation during bone regeneration."  [Id.].

On January 8, 2016, each of the Founders executed an identical Professional Services Agreement ("PSA") with the Company.  [Am. Compl. ¶ 13].  Among other services, each Founder was to

> render services supporting and advising the Company with respect to . . . Long term IP strategy, including providing input on IP / Patent approach – Patent Term Extension (PTE), Patent Term Adjustment (PTA), New Filings; guiding the Company's R&D focus, drive R&D direction, and build R&D programs (subject to mutually acceptable sponsored research agreements and receipt by Advisor from Company the necessary resources and authority to pursue IP and R&D programs recommended by the Advisor) to produce patent applications that if awarded will extend patent life of NELL-1 by at least 12 years; improve NELL-1 performance that if produced/purified/delivered properly by GMP protein contractor can increased Nell-1 half life by 25% over current Nell-1 patents set to expire in 2019, and work closely with Company patent counsel to build a robust IP "wall" around the Company's product portfolio.

[ECF No. 22-1 at 31].  In exchange for these services, each Founder would receive equity, vesting over time, as well as cash.  [Am. Compl. ¶ 14].  Under the PSAs, a given Founder's

---

[1] More specifically, the Founders founded Bone Biologics, Inc. in 2004.  [Am. Compl. ¶ 7 n.2]. In 2014, the Company was created via a reverse merge with another company.  [Id.].

unvested stock would be forfeited if that Founder's PSA were terminated for cause, but not if the PSA were terminated without cause.  [ECF No. 22-1 at 2].  The PSAs provide that "a material breach by [the Founders] . . . which is not cured within thirty (30) days after written notice by the Company setting forth the nature of such alleged breach" "shall constitute cause for termination."  [Id. at 3].

The Founders did not see eye-to-eye with LaNeve (or the Company's other directors and officers).  [Am. Comp. ¶¶ 16–22].  The Founders' primary complaint was a perceived lack of transparency regarding NELL-1's scientific progress.  [Id. ¶ 18].  Specifically, they believed that their access to raw data was being unduly obstructed and that they were, instead, receiving second- or third-hand updates and explanations from non-scientists, which interfered with their ability to track and scrutinize NELL-1's progress.  [Id. ¶ 19].  The Founders also criticized the overall performance of the Company's management, including LaNeve.  [Id. ¶ 20].  They voiced their criticism directly to management, claiming, among other things, that LaNeve and others had failed to raise outside capital and had mismanaged the money that the Company did have.  [Id. ¶ 21].

In late 2016, the Founders' conflict with the Company came to a head.  At an October 20, 2016 Board meeting, Dr. Wu stated that the Founders were being kept out of the loop on key scientific developments.  [Am. Compl. ¶ 22].  About a week later, Dr. Wu sent a follow-up email to the Board members, proposing improvements to how scientific information would be reported to the Founders.  [Id. ¶ 23].  Dr. Wu's email was not well received, especially by LaNeve, who resisted and tried to postpone discussion of Dr. Wu's proposal until a later date.  [Id. ¶ 24].  On October 28, 2016, Dr. Soo sent an email to LaNeve reiterating the concerns that Dr. Wu had articulated, but LaNeve did not respond.  [Id. ¶¶ 25–26].  Instead, on November 18, 2016,

LaNeve emailed the Founders asking them to provide documentation, within four days, concerning the progress that they had made in their Company-related scientific endeavors, including research pursuant to a Sponsored Research Agreement ("SRA") between the Company and UCLA.  [Id. ¶ 26].  A few days later, after the Founders questioned the sudden request and short deadline, LaNeve told them that he had not been properly updated on their work, citing their obligations under the PSAs.  [Id. ¶ 27].  On November 22, 2016, Dr. Soo responded, telling LaNeve that his request for documentation was disingenuous because the Company had not negotiated an SRA with UCLA or provided the Founders with any resources, and, for that reason, the Founders could not have undertaken the research contemplated by the PSAs.  [Id. ¶ 28].

On December 6, 2016, the Company's CFO circulated draft minutes from a November 9, 2016 Board meeting, which the Founders did not attend, memorializing a discussion concerning the Founders purported breach of their PSAs.  [Am. Compl. ¶ 31].  Two days later, Dr. Wu emailed the Board, disputing the characterization that the Founders had breached their agreements.  [Id. ¶ 32].  In his email, Dr. Wu noted, among other things, that the PSA, which would last for five years if not terminated sooner, contained no interim due dates and that the Company had not provided the resources necessary for the Founders to complete their work. [Id.].  On December 13, 2016, the Company sent the following letter to the Founders:

> By way of this letter, the Company is hereby providing you with written notice that the Company is terminating the Agreement for cause pursuant to Section 3(b) of the Agreement as a result of your failure to provide the Company with evidence that the Services (in particular those Services set forth in Exhibit 3, Section 1 of the Agreement) were rendered, as previously requested of you by the Company on November 24, 2016.  Absent your cure of the foregoing material breach of the Agreement to the Company's reasonable satisfaction and consistent with the requirements under the Agreement, termination of the Agreement shall be effective on January 12, 2017.  According to our records, there are no outstanding payments

owed to you under the Agreement, nor will any amounts become owed to you
following the termination of the Agreement.

[Id. ¶ 34].  Termination was delayed for several months while the Founders and the Company
attempted to resolve their differences.  [Id. ¶ 35].  After the parties' efforts at resolution proved
unsuccessful, the Founders' PSAs were terminated on April 8, 2017.  [Id. ¶ 36].  Because the
Company maintained that the PSAs were terminated for cause, it did not provide any additional
compensation to the Founders.  [Id.].  Shortly thereafter, the Founders resigned from their
positions on the Board (Drs. Wu and Soo) and Scientific Advisory Board (Dr. Ting).  [Id. ¶ 36
n.14].

## B.    Procedural Background

Plaintiffs filed their initial complaint on July 11, 2019, bringing claims against the
Company, LaNeve, and three other defendants (two individuals and the Company's largest
shareholder).  [ECF No. 1].  On August 12, 2020, the Court granted Defendants' motion to
dismiss, but permitted Plaintiffs to file an amended complaint within twenty-one days.  [ECF No.
21].  Plaintiffs filed their amended complaint on September 2, 2020.  [Am. Compl.].  They bring
a breach of contract claim against the Company, arguing that the Company breached the PSAs
by invoking the agreements' termination-for-cause provision when no cause existed (Count I),
and a tortious interference claim against LaNeve, alleging that LaNeve knowingly interfered
with the performance of the PSAs while acting outside his authority and in bad faith (Count II).
[Id. ¶¶ 48–57].  Defendants moved to dismiss on September 16, 2020, [ECF No. 23], and
Plaintiffs opposed, [ECF No. 28].

## II.    LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all
well-pleaded facts, analyze those facts in the light most favorable to the plaintiff, and draw all

reasonable factual inferences in favor of the plaintiff.  See Gilbert v. City of Chicopee, 915 F.3d 74, 76, 80 (1st Cir. 2019).  "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The alleged facts must be sufficient to "state a claim to relief that is plausible on its face."  Id. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability."  Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id. at 44 (quoting Iqbal, 556 U.S. at 679).  "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011)).  "The plausibility standard invites a two-step pavane."  Elsevier, 732 F.3d at 80 (citing Grajales, 682 F.3d at 45).  First, the Court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."  Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  Second, the Court "must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'"  Id. (quoting Morales-Cruz, 676 F.3d at 224).

## III.   DISCUSSION

The parties seem to agree that Delaware law governs Plaintiffs' claims, see [ECF No. 24 at 9–12 (citing Delaware cases); ECF No. 30 at 17–25 (same)], and the Court will therefore apply it.  Borden v. Paul Reverse Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991) ("Where . . .

the parties have agreed about what law governs, a federal court sitting in diversity is free, if it chooses, to forgo independent analysis and accept the parties' agreement.").

### A.      Plaintiffs' Untimely Filing

In its Order dismissing Plaintiffs' initial complaint, the Court gave Plaintiffs twenty-one days to file an amended complaint.  [ECF No. 21 at 24].  Local Rule 5.4(d) states that "[a]ll electronic transmissions of documents must be completed prior to 6:00 p.m. to be considered timely filed that day."  L.R. 5.4(d).  Accordingly, Plaintiffs had until 6:00 p.m. on September 2, 2020 to file their amended complaint.  Plaintiffs filed at 10:00 p.m.  [ECF No. 25 at 207]. Defendants ask the Court to dismiss the amended complaint on this basis.  [ECF No. 24 at 4–8]. Plaintiffs respond that such a harsh sanction is unwarranted given the length of the delay (four hours) and lack of prejudice.  [ECF No. 30 at 15–17].

"District Courts enjoy broad latitude in administering local rules."  Air Line Pilots Ass'n v. Precision Valley Aviation, Inc., 26 F.3d 220, 224 (1st Cir. 1994).  Under similar circumstances, courts in this district have excused untimely filings.  See Pearson v. Hodgson, No. 18-cv-11130, 2021 WL 1210358, at *2 n.2 (D. Mass. Mar. 31, 2021) (setting aside Local Rule 5.4(d)'s 6:00 p.m. deadline); Romero v. McCormick & Schmick Rest. Corp., No. 18-cv-10324, 2020 WL 1430530, at *1 (D. Mass. Mar. 24, 2020) (noting that district courts enjoy "broad latitude in administering local rules" and excusing an untimely filing because of minimal prejudice); Emerson v. Genocea Biosciences, Inc., No. 17-cv-12137, 2018 WL 839382, at *3 (D. Mass. Feb. 12, 2018) ("[T]he 6 p.m. deadline under the local rules is not sacrosanct."); Jackson v. United States, No. 08-cv-40024, 2011 WL 6301425, at *3 (D. Mass. Dec. 15, 2011) (disregarding untimeliness where resulting prejudice was minimal).  Notwithstanding

Defendants' protestations,[2] the prejudice here, if any, is negligible.  Thus, the Court will exercise its discretion to excuse Plaintiffs' noncompliance with Local Rule 5.4(d) and consider the merits of the instant motion.

### B.    Count I: Breach of Contract

Defendants argue that Plaintiffs have failed to identify a specific provision of the PSAs that was allegedly breached, and that Plaintiffs' factual allegations themselves demonstrate that the Company's termination of the PSAs was consistent with the contracts' terms.  [ECF No. 24 at 9–10].  Plaintiffs respond that their allegations are sufficient to withstand a motion to dismiss. [ECF No. 30 at 17–23].

"Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."  H-M Wexford LLC v. Encorp, Inc., 832 A.2d 129, 140 (Del. Ch. 2003).  Plaintiffs have pleaded the first and third elements.  [Am. Compl. ¶¶ 13–14 (existence of contractual obligation), 36 (forfeiture of unvested equity)].  Accordingly, the question before the Court is whether Plaintiffs' factual allegations plausibly suggest that the Company breached its contractual obligations.

Plaintiffs' breach-of-contract claim implicates two interrelated provisions of the PSAs: the compensation provision and the termination provision.  First, the Company's compensation-related obligations are contingent on whether a given Founder's PSA is terminated with or without cause.  [ECF No. 22-1 at 2–3].  If the Company terminates a PSA with cause, it

---

[2] Although Defendants point out that the better practice would have been for Plaintiff's counsel to seek an extension and note that Plaintiffs have been engaged in litigation with Defendants, on multiple fronts, since mid-2018, which renders the amended complaint Plaintiffs' "fourth bite at the apple," [ECF No. 24 at 4–8], nowhere do they make clear how receiving Plaintiffs' amended complaint at 10:00 p.m., as opposed to 6:00 p.m., prejudiced them.

is relieved of its compensation obligations and the Founder's unvested equity is forfeited.  [Id.].
If, on the other hand, the Company terminates a PSA without cause, the Founder's equity vests.
[Id.].  Second, the Company is permitted to terminate the PSA "for cause upon thirty (30) days
prior written notice in the event of a material breach of this Agreement by the other party that
remains uncured at the conclusion of such thirty-day notice period."  [ECF No. 22-1 at 3]; see
[ECF No. 22-1 at 4 ("For purpose of [the termination-for-cause provision], the following events
shall constitute cause for termination . . . [a] material breach by [a Founder] . . . which is not
cured within thirty (30) days after written notice by the Company setting forth the nature of such
alleged breach.")].  Plaintiffs acknowledge that the Company provided the required thirty days'
notice and represent that they received no additional compensation after their PSAs were
terminated.  [Am. Compl. ¶¶ 34, 36].  Accordingly, as long as Plaintiffs materially breached their
PSAs, the Company was within its rights to terminate their contracts for cause and then to
withhold any further compensation.  If, however, Plaintiffs did not materially breach their PSAs,
there was no cause for the Company to terminate and Plaintiffs should have been paid.  In sum,
the viability of Plaintiffs' breach-of-contract claim rises and falls on whether their factual
allegations plausibly suggest that they did not materially breach their PSAs (and, therefore, that
the Company breached by refusing to compensate them).  The Court finds that they do.

Plaintiffs have alleged, and/or the PSAs themselves demonstrate, the following facts:
(1) the Founders executed the PSAs in January 2016, [Am. Compl. ¶ 13]; (2) unless terminated
sooner, the PSAs would last for five years, [ECF No. 22-1 at 3]; (3) over the life of the PSAs,
Plaintiffs were required to render services to the Company, including scientific research, [id. at
31]; (4) the PSAs contemplated the Company negotiating "mutually acceptable [SRAs]" and
providing "necessary resources and authority" to facilitate that scientific research, and made

Plaintiffs' performance contingent on the foregoing, [id.; Am. Compl. ¶¶ 40–41]; (5) in November 2016, eleven months into the PSA's five-year term, the Company demanded proof that Plaintiffs were making progress with respect to their scientific research, [Am. Compl. ¶¶ 26–27]; (6) on their face, the PSAs do not establish any interim deadlines for scientific research progress or provide a specific mechanism for documentation of such progress, see [ECF No. 22-1 at 31]; and (7) the Company did not negotiate SRAs or provide Plaintiffs with resources for their research, [Am. Compl. ¶ 40].  Taken together, these allegations plausibly suggest that Plaintiffs did not materially breach their PSAs and that, by extension, the Company breached by depriving Plaintiffs of post-termination compensation where cause to terminate, as defined by the PSAs, did not exist.

Given their burden at this stage and the deference due to their factual allegations, see supra, Section II, Plaintiffs have done enough to survive Defendants' motion.  Therefore, Defendants' motion to dismiss Count I of the amended complaint, [ECF No. 23], is DENIED.[3]

### C.     Count II: Tortious Interference

Defendants argue that Plaintiffs' tortious interference claim against LaNeve fails because there are no factual allegations demonstrating a personal, selfish, or retaliatory motive for the

---

[3] The Court's decision here is not inconsistent with its Order dismissing Plaintiffs' original complaint.  [ECF No. 21].  First, the material breach waiver doctrine is inapplicable under the circumstances because Plaintiffs' revised allegations do not suggest that the Company had materially breached the PSAs by failing to negotiate an SRA and provide resources by November 2016.  Accordingly, there was no material breach for Plaintiffs to waive but rather merely a condition precedent to performance that had not yet been met.  Second, the factual allegations in the amended complaint, and the language of the PSAs, plausibly suggest that Plaintiffs were not actually required to have performed any services, let alone provided documentation of the same, only eleven months into a five-year contract and when conditions precedent to such performance had not yet been satisfied.  Thus, it is immaterial that Plaintiffs do not allege that they performed under the contract, see [ECF No. 21 at 12], because the allegations plausibly suggest that they were not in breach.

alleged tortious interference.  [ECF No. 24 at 10–12].  Plaintiffs maintain that their allegations

with respect to motive are sufficient.  [ECF No. 30 at 23–25].

"The elements of a tortious interference claim are well established under Delaware law:

'There must be (1) a contract, (2) about which defendant knew and (3) an intentional act that is a

significant factor in causing the breach of such contract (4) without justification (5) which causes

injury.'"  Aspen Advisors LLC v. United Artists Theatre Co., 861 A.2d 1251, 1265–66 (Del.

2004) (quoting Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983, 992 (Del. Ch.

1987)).  The parties seem to dispute only the fourth element.[4]  As discussed in its Order

dismissing Plaintiffs' initial complaint, ordinarily, LaNeve would be insulated from Plaintiffs'

tortious interference claim because of his affiliation (and aligned interests) with the Company.

See [ECF No. 21 at 16–17].  That protection, however, does not apply

> when a plaintiff alleges sufficient facts to show that the interfering party was "not
> pursuing in good faith the legitimate profit seeking activities of the affiliated
> enterprises," but was "motivated by some malicious or other bad faith purpose to
> injure the plaintiff."  To be protected by the privilege, individual defendants must
> act solely within the scope of their employment.  Therefore, "an officer or director
> may be held personally liable for tortious interference with a contract of the
> corporation if, and only if, said officer or director exceeds the scope of his agency
> in so doing."  Thus, for an individual defendant to be held liable on a tortious
> interference claim, the plaintiff must show that the individual was acting (1) with
> bad faith, and (2) outside the scope of their employment.

[Id. at 17 (citations and footnotes omitted)].  Whether a particular employee is acting outside the

scope of his employment is generally a fact-intensive inquiry unlikely to be resolved at the

motion to dismiss stage.  See Nelson v. Fleet Nat'l Bank, 949 F. Supp. 254, 263 (D. Del. 1996)

("Whether an employee has acted beyond the scope of employment is generally a question for

---

[4] In their brief, Defendants argue that because Plaintiffs fail to state a claim for breach of
contract, their tortious interference claim fails as a matter of law.  [ECF No. 24 at 10].  Because
the Court has already determined that Plaintiffs have adequately stated a breach-of-contract
claim, Defendants' argument fails.

the jury, although the Court may decide it as a matter of law if it is very clear."); Wagenhoffer v. VisionQuest Nat'l Ltd., No. N14C-10-203, 2016 WL 4053117, at *2 (Del. Super. Ct. July 27, 2016) (same); Smith v. Hercules, Inc., No. 01C-08-291, 2002 WL 499817, at *3–4 (Del. Super. Ct. Mar. 28, 2002) (noting that the Court could not resolve whether company's CEO was acting within the scope of his employment, for purposes of a tortious interference claim, without a more fully developed factual record).

Here, Plaintiffs' allegations regarding LaNeve are sufficient to defeat Defendants' motion to dismiss.  Specifically, Plaintiffs allege that they harshly (and repeatedly) criticized LaNeve's management of the company, [Am. Compl. ¶¶ 20–21], and that LaNeve's statements regarding a purported breach and request for documentation of performance came soon after that criticism was voiced, see [id. ¶¶ 26, 31, 44].  Taking these facts in the light most favorable to Plaintiffs, and drawing reasonable inferences therefrom, see Gilbert, 915 F.3d at 76, 80, the Court finds that Plaintiffs' allegations plausibly suggest that LaNeve caused the Company to breach the PSAs based on personal animus towards Plaintiffs brought on by their pointed and persistent criticism of his management of the Company.  Thus, although LaNeve may ultimately prevail, the Court will not "cut off the development of the case through discovery at this juncture of the litigation," Smith, 2002 WL 499817, at *3, and Defendants' motion to dismiss Count II of the amended complaint, [ECF No. 23], is therefore DENIED.

## IV.   CONCLUSION

Accordingly, for the reasons set forth above, Defendants' motion to dismiss, [ECF No. 23], is DENIED.

**SO ORDERED.**

April 13, 2021                                              /s/ Allison D. Burroughs
                                                            ALLISON D. BURROUGHS
                                                            U.S. DISTRICT JUDGE